### GEORGIA RAILROAD AND BANKING COMPANY *v.* LYBREND, and *vice versa.*

1. On the trial of a civil action at which the plaintiff testifies as a witness in his own behalf, it is competent for the defendant to prove that the plaintiff, in furtherance of this identical cause and for the purpose of prevailing therein, had been guilty of base, dishonorable or criminal conduct. Evidence of this character is admissible in behalf of the defendant, both to discredit the plaintiff as a witness and to throw suspicion upon the justice of his cause of action.

2. Accordingly, the defendant in such case may show that at a previous stage of the suit, the plaintiff made an affidavit in which he denied the truth of material statements in another affidavit made by an adverse witness, and that the plaintiff afterwards, when testifying in the cause, admitted that his own affidavit, or a part of it, was wilfully false. And where both relevant and irrelevant matters are so blended in the two affidavits as to render it necessary that both should be read in full, in order to clearly understand what and how much of the first was denied in the second, and in order to apply the substance of the latter to that of the former, the whole of the two may be offered and received in evidence together, and it will be no legal objection to their admissibility that some of the contents of one or both, taken separately, are not relevant and, if so taken, would not be admissible.

3. An admission by a party to a cause on trial, made by him while under examination as a witness upon a former trial of the same cause, that he had intentionally sworn falsely in an affidavit intended to be used, and which was actually used, in his behalf

in resistance to a motion for a new trial, is admissible in evidence against him, as showing an improper and unconscionable effort on his part to interfere with the due course of justice, and also to discredit him as a witness at the trial in which evidence of such admission is offered; and where the whole of his previous examination relating to this particular matter would better indicate the scope and precise import of the admission in question than would a part only of such examination, the whole is admissible, although some of it, separately considered, may be irrelevant.

4. It is not essential to the admissibility of such affidavit and examination, for the purposes indicated, that they should contain anything in conflict with the testimony of the party at the last, or pending trial, in which they are offered in evidence.

5. A party, though introduced as a witness in his own behalf, may, upon cross-examination as to matters not voluntarily testified about on his direct examination, decline to give testimony which would tend to criminate him, or to bring infamy, disgrace or public contempt upon himself or his family, notwithstanding the fact that at a previous trial of the case he had waived his privilege of remaining silent as to these matters. A waiver of this kind is not binding upon a witness at a trial subsequent to that at which the waiver was made.

6. Other than as above indicated, there was no error either in rejecting or in ruling out evidence.

*Atkinson, J.*, dissenting.

July 27, 1896. Argued at the last term.

Action for damages. Before Judge Lumpkin. Fulton superior court. September term, 1894.

*Joseph B. & Bryan Cumming* and *Hillyer, Alexander & Lambdin*, for the railroad company.

*James W. Austin* and *George Westmoreland*, contra.

LUMPKIN, Justice.

In 1888, Lybrend brought an action for personal injuries against the Georgia Railroad & Banking Company. The case has been tried three times in the superior court. The first trial resulted in a verdict for the plaintiff, which the trial judge set aside upon the defendant's motion for a new trial. There was a mistrial; and afterwards, another trial in which the jury again found for the plaintiff an amount considerably smaller than that for which the first

verdict was rendered. The defendant again moved for a new trial, which was refused, and it excepted. The following condensed statement will present the case so far as is material to an understanding of the points upon which this court has ruled.

It appeared at the trial now under review, that Lybrend purchased in Cleveland, Ohio, a coupon ticket to Augusta, Ga. The last coupon of this ticket was good for passage from Atlanta to Augusta over the Central Railroad, but not over the railroad of the defendant. On reaching Atlanta, Lybrend boarded a night train of the Georgia railroad, which was about to leave for Augusta. Upon this train was a colored woman who held a ticket exactly similar to that of Lybrend. Soon after the train started, the conductor approached the woman, examined her ticket, informed her that it was not good over the Georgia railroad, and thereupon stopped the train and ejected her. A few minutes later, he reached Lybrend; and after looking at his ticket, gave him the same information which had been given to the woman. Lybrend, though recognizing that his ticket was not good upon that train, insisted upon remaining thereon, and urged the conductor to accept this ticket for his passage to Augusta. The conductor declined to do this, stating to Lybrend that he must pay his fare or leave the train. The latter then insisted upon being taken back to the passenger depot whence the train had started. The conductor refused to comply with this demand, and ejected Lybrend from the train. According to his account of the transaction, as a witness in his own behalf, he was forced by the conductor's language and conduct, which were threatening and violent, to leave the train while it was yet in motion, and in consequence received a fall by which his leg was broken. On the other hand, according to the testimony of the conductor, who was directly corroborated by other employees of the defendant, no harshness or violence was used towards Ly-

brend; the train came to a full stop, and he alighted in safety and walked away entirely unhurt. Later in the night, he was found at a place some distance from the scene of his expulsion from the train, with a fractured leg. His contention was that he crawled in his injured condition over the space intervening between these points; and the contention of the defendant was that he received his injuries in some way unknown to it or its servants after he had been left in perfect safety by the train from which he was expelled. The testimony of the defendant's employees was further corroborated as follows: A number of disinterested witnesses testified to the expulsion of a man from a night train of the defendant at about the date upon which Lybrend was ejected. These witnesses were unable to positively identify him as the man to whom their testimony related, but they fixed the night upon which they saw the man ejected as the same upon which a colored woman had been expelled from the same train, and swore that he was not hurt. There is therefore no room for any reasonable doubt that the man whom the witnesses saw ejected from the train was Lybrend; and if this be true, their testimony fully sustains the account of the matter given by the conductor and the other servants of the company, and accordingly tends most strongly to show that Lybrend was not injured by his expulsion from the train.

It is already obvious that the presence of the colored woman upon the train and her expulsion therefrom were matters of great materiality to the defense, and the importance of these facts will become the more apparent as we proceed. This woman, whose name is Martha Comer, was not sworn as a witness at the first trial. Doubtless the defendant's counsel were not then aware of her presence upon the train on the night in question, or of the facts which will presently be disclosed. One of the grounds of the first motion for a new trial was based on newly discovered evidence, predicated upon the following affidavit of this woman:

"During the month of September I was frequently visited by Andrew T. Lybrend. He asked me to run off with him. I refused time and again. But he kept on begging me to go. I told him that he had a wife and that I did not want to go. Andrew said his wife did not love him and he did not love her. I agreed to go. But when the time came, I backed out. But he kept on begging me. I agreed to go several times, but every time I got scared to go, and would back out. At last he said, that if I did not go, he would kill me; so I told him I would go. I asked him why he was going off in the middle of the crop-gathering season. And I asked how he was going to pay Mr. Jos. Watson, a storekeeper at Ridge Springs, the money he owed him for advances. Andrew and I were working together, and I asked him how he would get money to go on. He said he had some cotton he would sell, and that Mr. Watson could take what was left; and if that did not pay him, he could make out the best way he could. Andrew gave me some money about the first of October. I went on the train from Wards to Augusta, arriving there about nine o'clock in the morning. By agreement, Mr. Lybrend met me at the depot in Augusta. He had driven from his home at Wards with a load of cotton, which he sold in Graniteville. He said he had $180. We were not in Augusta more than an hour. We took the Georgia railroad and went to Atlanta. Before we left Augusta, Mr. Lybrend asked me where I wanted to go. I said I did not know. He said: 'Don't you want to go to Ohio, where Jack Holmes lives?' I said: 'Yes; that will do.' Jack Holmes was a white man who left here about eight years ago and went to Ohio with a colored woman. Andrew did not know anything about traveling. I had been traveling before, when my family went to Texas. When we got to Atlanta, I showed him where to buy his tickets, and I got the trunks checked. We went from Atlanta to Cleveland, Ohio, direct. We got there Sunday morning before day. A man showed us the way to a hotel. Andrew told me he would have to change his name; that if he did not, his wife's people would pursue him, or Mr. Watson would get after him for the money he owed. Andrew asked me what name he should assume. I told him 'Walter Smith.' When we got to the hotel, we were registered as 'Mr. Walter Smith and Wife.' We staid there about three days.

We left Cleveland and went to Willoughber, where we staid there one night. The next day we went out in the country about three miles. We lived with Sam Brown, a white man. Our work was to pick up apples. I was paid fifty cents, and he was paid seventy-five cents a day. We staid there three weeks. I wanted to stay, but Andrew got dissatisfied and wanted to leave. The people's politics did not suit him, and he felt cheap and wanted to get away. I would have staid, but he wanted me to come with him; and he would not leave me any money, so I had to do so. We then went to Willoughber. At Cleveland we bought tickets to Augusta. He then checked the trunks. He gave me the wrong check. We got to Atlanta Friday night. I can read, and saw that our tickets were over the Central railroad. The conductor on the Chattanooga train said to us: 'Yonder is your train.' Andrew and I got on the train he pointed out. Before we got on, I told him that was not the train. He said, 'Oh, yes it is; and I am going to get on;' and he did so. I went into one coach, and he went into another just behind mine. When the conductor came around, I gave him my ticket. He said, 'You are on the wrong train.' I said, 'Don't this train go to Augusta?' He said, 'Yes, but this ticket is for the Central railroad.' I would have told him about Andrew was on the train and that he had a ticket like mine, but Andrew and I had agreed to part at Atlanta and not seem to know each other. The conductor then asked me if I wanted to get off there, or go to the next station. He said, 'We are not far from Atlanta.' I told him I would get off there. He pulled the bell rope and stopped the train perfectly still. The conductor then walked down the aisle in front of me, got out of the car and held his lantern up for me to see how to get off. The night was very dark. The conductor said, 'Do you see that light?' I said, 'Yes.' He said, 'That is the light under the Union Depot shed.' I then thought I would wait and see if Andrew was put off. The train went a good piece further and then I saw it stop, and saw and heard it start again. I waited for some time, but Andrew did not come back. When the train stopped the second time I saw lights, like those of lanterns, along the side of it. I went back to Atlanta. At six o'clock the next morning I got on a Central train and came through on the same ticket by Macon

to Augusta. In Cleveland the checks got mixed, and his trunk came to me, and mine to him. He then sent me my trunk and I sent him his. On the way back I told him I was in a family way. He said, 'Well, I will support you and your child, if you have one. The child is mine,' he said, 'and I will support it until it is grown.' Andrew has never given me or his child one thing since I got back or it was born. He sent a man named Isaac Lawman, who worked for him, to tell me that he wanted to see me, so that he could tell me what to say if the man from out yonder came to see me—that he was suing the railroad. I told him that I would not go to him or fool with him. I have never had anything to say to him. In May after we got back, I saw him at work several times. Every time I saw him he did not appear to be crippled. I did not go home at once, but stayed in Edgefield village until May; but the first time I saw him he was at work. His reputation in that community is bad. I would not believe him on his oath; he has broken every promise he ever made me."

While the first motion for a new trial was pending, Lybrend made an affidavit in response to that of Martha Comer, and it was used before the judge for the purpose of overcoming the effect of her statements, so as to prevent, if possible, the granting of a new trial. In his affidavit he deposes:

"That he has read the statement said to have been made by Martha Comer, and that he pronounces it a batch of wilful lies, malicious and slanderous, and that he is prepared to prove them false; that the design and purposes of the said statement he knows not of his own knowledge, but he is reliably informed that she was paid money for the statement, and told that the money was for lost time. How much money was paid her deponent knoweth not. That the said Martha Comer is unreliable and unworthy of belief or both; that he denies ever having connection with her, while he knows her to be a public prostitute; that she never before claimed that he was the father of her bastard child; that she has never asked him for any help to support her child; that with such a state of feeling exhibited in her purported statement, she would have long ago deman-

ded aid of him, if he had been the father of her child, as he believes; that she had at her command the laws of the land, which compel the support of bastard children by the father, to which she has never applied to his knowledge. That he did go to Ohio, on a business trip, but returned immediately to his home and family; that the minute private details governing his movements he thinks it unnecessary now to state, but would do so if necessary; that his wife knew his movements and whereabouts; that he wrote her frequent letters in his absence. That he is now, as he has ever been, living quietly with his family and trying to support them; that other statements made by Martha Comer are false. That he has read the affidavits made by A. W. Horne and others that he played baseball, which is true as far as it goes; that he believes that if the question had been put and answered by the said Horne and others as to his lameness, that they would have said then, 'he could not run well,' or 'hobbles badly when he runs.' That he has reason to believe that this question was asked and answered, but they are omitted or not put in. That he does try to play baseball and tries to run, but cannot run the bases, only hobbles over them; that baseball was his favorite pastime before he was hurt, and he was an efficient player; that he thinks the moderate exercise of this is better for his injured leg. That he has read the affidavit of Dr. DuBose and believes it true, but discerns that he does not say that he has recovered, which he could not say, as he had not examined him since he dismissed him. That he is informed that one Jos. M. Ward has been with some strange men going from time to time through the community getting affidavits from negroes in their houses to damage him; that the said Jos. M. Ward is known as a busybody; that he is a man without character, that he is informed he does not believe in God; that he is a drunkard and without means except a small house and lot given him by his brother, the Hon. Clinton Ward, through whose influence he got to be railroad agent, and that he does not now speak to his own brother, or if he did, but to abuse him; that he is unworthy of belief on oath. That he has read the libelous letter written by him to agent at Atlanta, which is false and slanderous, and its dirtiness shows the character of the man; that he is reliably informed that he is

talking for money in this case, according to his own words spoken to a neighbor."

After Lybrend had testified as a witness in his own behalf at the last trial, these affidavits were offered in evidence by the defendant, "as having been used on the hearing of a motion for a new trial in this case; and it was stated in offering them, and not denied or contested, that the affidavit of Martha Comer was the same introduced on a motion for new trial in this case from.a former verdict, as newly discovered evidence, and the affidavit of Lybrend was an affidavit used on the hearing of the motion as a counter-affidavit, and that both were on file in this court." In the same connection, the defendant's counsel offered to prove that upon the previous trial, at which the jury had failed to agree upon a verdict, Lybrend, while upon the stand as a witness, when confronted with his own affidavit, which is copied above, admitted that he had made it, and admitted "that he had sworn false in that affidavit." Some of the evidence offered to show this alleged admission was embraced in the following dialogue, which the defendant tendered as a portion of Lybrend's testimony at the time of the mistrial:

"*Q.* What relation was Frank Miles and Martha Comer? *A.* A step-daughter. I was out in Ohio with that darkey. I want to tell you that. I am ashamed of it and sorry for it; and if I was able, I should have some witnesses from South Carolina to prove to you gentlemen that my conduct is not down there yet. I have got that much to say.

"*Maj. Cumming:* What is it you are ashamed of? *A.* Ashamed of being in Ohio with this negro.

"*Q.* Are you ashamed of having made that affidavit too? *A.* Yes, I am sorry and ashamed of it.

"*Q.* Then you are ashamed you made the affidavit because it was not true? *A.* I am ashamed of it; some of it is true, and some of it is not.

"*The Witness:* That part of her affidavit about my

saying about supporting her child, and that I did not love my wife, is not true.

"*Q.* The rest of it is true? *A.* Some portions of it is not true; and that she said I would kill her if she did not go, that is not true.

"*Q.* What else is not true? *A.* Being at Ohio with her was true."

The court rejected the affidavits and the oral testimony, and, in this connection, we extract the following recital from the motion for a new trial : "Said evidence was offered for the purpose of impeaching the said plaintiff as a witness in the case, by showing that he had sworn falsely in it and had made contradictory statements in it touching the same, not on this trial, but a former trial of the same case on motion for a new trial, and said evidence (taken down by the stenographer on the former trial) being further offered as admissions by the said Lybrend of the truth of the facts stated.    It was objected to on the ground that such evidence was irrelevant and was not available for purposes of impeachment.  The court ruled it out, and defendant says the court erred therein, and alleges the same as cause for new trial.    When these papers were offered in evidence, the court inquired whether they were offered as showing that the witness had previously made statements conflicting with his testimony on the present trial; to this counsel replied that they were not, but to show that on the motion for a new trial, and on another trial which resulted in a mistrial, he had sworn to conflicting statements, sworn falsely, and that the evidence on the former trial was also offered as admissions of plaintiff and to identify the time."

Lybrend did not upon his direct examination at the last trial give any testimony as to the trip to and from Ohio, or as to his relations with the woman, Martha Comer.    It is manifest that his counsel deliberately and intentionally so directed his examination as to avoid inquiry into these matters.    Upon cross-examination, counsel for the defendant sought to draw him out concerning them, but he de-

clined to answer certain questions in relation thereto, the answers to which would have tended both to criminate him and to bring infamy, disgrace and public contempt upon himself and his family.   Upon objection, the court refused to allow the cross-examination to proceed upon this line.

We will now discuss the head-notes in the light of the facts as above stated.

1-4.   The first four may be considered together.   It will be observed that the objection made to the admissibility of the affidavits and the oral testimony referred to in these notes was that this evidence "was irrelevant and was not available for purposes of impeachment."   It appears, therefore, that the plaintiff's counsel did not present the distinct objection that this was evidence offered "in bulk," containing matter both relevant and irrelevant, and that the former should have been pointed out and offered separately.   The objection taken, so far as it relates to irrelevancy, was, in effect, that all of this evidence was irrelevant; and this is certainly not true, for much of it was decidedly relevant and important.   The trial judge, therefore, in view of what is said in *Harris & Mitchell* v. *Amoskeag Lumber Co.*, 97 *Ga.* 465, concerning the rules of practice in matters of this kind, might very well have ignored this particular ground of objection, and would have been fully justified in so doing; for upon its general complexion this case is not one entitling the plaintiff to anything more than his strict legal rights.   His counsel ought to have pointed out and objected separately to those portions of this mass of evidence which they claimed to be irrelevant, if they conceded that any of it was relevant.   On the other hand, unless it was the right of the defendant to have this evidence admitted as a whole, it was, under the decision of this court in the case just cited, equally incumbent upon its counsel to separate the admissible portions from the inadmissible, and offer the former portions only.   Whether, therefore, error was committed in rejecting the affida-

vits and Lybrend's oral testimony must, at last, depend upon whether or not all of this evidence should have been allowed to go to the jury. We will endeavor, before concluding, to show that the judge ought to have permitted the defendant to introduce the whole of it. In order to properly discuss this matter, we must begin by noticing the other ground of objection to this evidence, viz: That it "was not available for purposes of impeachment," and ascertain clearly the real purpose for which it was offered. While it is true that the motion for a new trial does recite that it was offered for the purpose of "impeaching" Lybrend as a witness, it is apparent that the word just quoted is not here used in its ordinary and technical signification, for obviously there was no attempt to "impeach" Lybrend by showing that he had before the last trial made statements, either in writing or orally, contradictory of what he had at that trial sworn upon the stand. It was plainly not an effort at impeachment, under section 3871 of the code, "by proof of contradictory statements previously made." The only fair and reasonable conclusion to be drawn from the recitals of the motion for a new trial which relate to this matter, and which are fully set forth in the foregoing preliminary statement, is that the evidence in question was offered for the purposes of attacking Lybrend's alleged cause of action and discrediting him as a witness by showing that he had been guilty of base, dishonorable and criminal conduct in connection with this identical case. We will not again repeat or make extracts from the recitals referred to, but we feel absolutely safe in saying that an examination of them will show we have correctly stated the real objects the defendant's counsel had in view in offering the evidence under consideration. That a witness may be thus discredited by testimony competent for the purpose is not to be doubted. Treating Lybrend as a mere witness, and leaving out of consideration his interest in the case as a party, the defendant's right to discredit him

by showing conduct of the nature above indicated cannot be questioned. In every instance the state of mind of the witness, the motives which will probably influence his testimony, and the temptations which may beset him to swear falsely, are important to be known in passing intelligently upon his credibility. Section 3876 of the code declares that: "The state of the witness's feelings to the parties, and his relationship, may always be proved for the consideration of the jury." This section being simply declaratory of a general common law principle, it is helpful to ascertain from the decisions of the courts in what instances it is applicable. The following are some of the many illustrations which might be cited.

A witness may be asked "whether the party for whom he is a witness did not purchase the witness's real estate, at the request of the witness." Cameron *et al. v.* Montgomery, 13 S. & R. 128. It may be shown that the plaintiff had assisted his witness in a lawsuit between the latter and the defendant. Hutchinson *v.* Wheeler, 35 Vt. 330. It is competent to prove that a witness, when speaking of the action, had declared "she would do all she could to help the defendants, she'd be damned if she wouldn't." Inhabitants of New Portland *v.* Inhabitants of Kingfield, 55 Me. 172. Or, that a witness had said "she knew nothing about the case, except what her husband had told her; and that her memory was so treacherous, her husband had to keep telling her what to testify to." Davis *v.* Roby, 64 Me. 427. Or, that a witness had stated that "he had testified in court for the defendant, but thought if the case was tried again, he should testify for the plaintiff." Chapman *v.* Coffin, 14 Gray, 454. It may be proved that "the witness has attempted to buy or bribe other witnesses." Luhrs *v.* Kelly, 67 Cal. 290. "Where a witness for the plaintiff has attempted to suborn a witness to swear falsely in the cause against the defendant, and on his cross-examination denies that he has done so, the defendant may give

evidence to contradict him in that respect." Morgan *v.*
Frees, 15 Barb. 352, holding that this was a material and
relevant, and not a mere collateral issue. "A witness, hav-
ing testified in a case, afterwards stated out of court that he
had testified falsely and had been hired by the party who
called him to do so. Held, that these statements might be
proved in court for the purpose of discrediting his testi-
mony." McGinnis *v.* Grant, 42 Conn. 77. It is always
competent to prove that a witness has attempted to tamper
with another witness, and to contradict by evidence a denial
of such attempt. Folsom *v.* Brann, 5 Foster, 114, 122.
Offering to receive a bribe to leave the jurisdiction of the
court is a fact affecting the credibility of a witness. State
*v.* Downs, 3 S. W. Rep. 220. See, also, 1 Thomp. Trials,
§4531, and 3 Rice, Ev. 227, the text of which, in the words
below quoted, is taken from the opinion of Paine, J., in
Martineau *v.* May, 18 Wis. (republished) *57: "The
general rule that a witness cannot be impeached by contra-
dicting him as to collateral matters is well understood.
But it has been held that the feelings of the witness, and
his disposition to tell or conceal the truth in the particular
suit in which he is called, are not collateral within the
meaning of the rule." These authorities show with un-
mistakable conclusiveness that the language or conduct of
a witness indicating interest, prejudice, partisanship or
partiality, in the case on trial, may be proved for the pur-
pose of discrediting him.

The rule applies, of course, with still greater force where
the witness is a party seeking to establish a claim or de-
fense by his own testimony; and it also seems to be unques-
tionable that proof of a party's corrupt conduct in endeav-
oring to sustain his side of the case is admissible against
him, even where he has not been sworn as a witness for
himself. The evidence with which we are now dealing
was offered to show that Lybrend had committed perjury
in order to hold a verdict he had obtained against the rail-

road company and prevent the granting of a new trial; and further, that he had subsequently admitted under oath the commission of the perjury. Such evidence was not only competent as affecting his credibility, but as bearing upon the general merits and righteousness (or, rather unrighteousness) of his cause. No less an authority than Lord Chief Justice Cockburn may be cited in this connection. The following is taken from his opinion in Moriarity et ux. v. London &c. Railway Co., L. R. 5 Q. B. 319: "The conduct of a party to a cause may be of the highest importance in determining whether the cause of action in which he is plaintiff, or the ground of defence, if he is defendant, is honest and just; just as it is evidence against a prisoner that he had said one thing at one time and another at another, as shewing that the recourse to falsehood leads fairly to an inference of guilt. Anything from which such an inference can be drawn is cogent and important evidence with a view to the issue. So, if you can show that a plaintiff has been suborning false testimony, and has endeavoured to have recourse to perjury, it is strong evidence that he knew perfectly well his cause was an unrighteous one. I do not say that it is conclusive; I fully agree that it should be put to the jury, with the intimation that it does not always follow, because a man, not sure he shall be able to succeed by righteous means, has recourse to means of a different character, that that which he desires, namely, the gaining of the victory, is not his due, or that he has not good ground for believing that justice entitles him to it. It does not necessarily follow that he has not a good cause of action, any more than a prisoner's making a false statement to increase his appearance of innocence is necessarily a proof of his guilt; *but it is always evidence* which ought to be submitted to the consideration of the tribunal which has to judge of the facts." The doctrine so clearly stated in these apt and well-chosen words rests upon the same principle as that

laid down in Gray *v.* Haig, 20 Beav. 219, wherein it was held: "When an accounting party destroys the accounts before the matters have been finally adjusted, and still more pending a litigation, the court will presume every-thing most unfavorable to him, consistent with the estab-lished facts." And see James *v.* Biou, 2 Sim. & Stuart, 606, in which Sir John Leach, in the High Court of Chancery, held that: "The suppression of some of a series of docu-ments admitted to be in possession of the party who pro-duces the others, is evidence that the documents withheld afford inferences unfavorable to that party who withholds them." The same doctrine undoubtedly obtains in this country. Thus, in Snell *et al. v.* Bray, 56 Wis. 156, it was held that: "Letters written by, or at the instigation of, a party to an action, to third persons, warning them not to aid the other party or testify in the action, or urging them to testify to a particular state of facts, are in the nature of admissions by conduct, and are admissible in evidence. It is immaterial that such letters were written before the ac-tion was commenced, if the cause of action had been asser-ted and a controversy concerning it was then in progress." In the opinion (page 164), Lyon, J., cites the Moriarity case, *supra*, and 1 Greenlf. Ev. §196, which is in point upon the principle involved. "Where a party is proved to have suppressed any species of evidence, or to have destroyed or defaced any written instrument, a presump-tion arises that had the truth appeared it would have been against his interest, and the fabrication of evidence raises a presumption against the party doing so, no less than when evidence has been suppressed or withheld." Winchell *et al. v.* Edwards *et al.*, 57 Ill. 41. "On the trial of a case it may be shown that a party has destroyed or suppressed material evidence, or has fabricated such evidence, as it implies an admission that he has no right to recover if the case is tried on the evidence as it exists." Chicago City Ry. Co. *v.* McMahon, 103 Ill. 485. "All efforts by either

party to a suit or his authorized agent to destroy, fabricate, or suppress evidence may be shown, such acts being in the nature of an admission that the party has no sufficient case unless aided by suppressing evidence or by the fabrication of more evidence." Lyons *et al. v.* Lawrence, 12 Ill. App. 531; 1 Thomp. Trials, §795. "The alteration, suppression, falsification, destruction or manufacturing of evidence raises a presumption against the spoliator. . . *Omnia præsumuntur contra spoliatorem."* Lawson, Presump. Ev. 140.

The defendant's right to prove that Lybrend committed perjury in support of his verdict, and that he subsequently admitted under oath that he had done so, stands demonstrated beyond doubt. In this proposition we all concur, but our Brother Atkinson thinks the court rightly rejected the evidence offered for this purpose, because it contained much irrelevant matter which would tend to unfairly prejudice Lybrend's case before the jury. As we have already pointed out, his counsel did not make this specific objection ; but aside from this, the Chief Justice and the writer think the evidence ought to have been admitted just as it was offered. It is true that Lybrend's abandonment of his family and his disgraceful escapade and liaison with this colored woman are immaterial and irrelevant upon the question whether he was improperly ejected from the defendant's train and thereby injured; but his perjury, whereby he fabricated evidence in his favor, and his admission that he had been guilty of the perjury, are admissible against him. The blending of the relevant and irrelevant has resulted from the course which he pursued, and from the fraudulent, wrongful and unconscionable manner in which he has dealt with his own case. It is impossible to unmix the elements essential to a fair view of the whole matter, and Lybrend has no right to have this view excluded from the jury simply because it will bring to light some things not really pertinent. He is largely

responsible for the manner in which the irrelevant and relevant matters have become commingled. He ought not to be allowed to muddy the water, and then complain of the mud. His own affidavit cannot be clearly understood unless read in connection with the whole of Martha Comer's, and all his oral testimony embraced in the dialogue copied above is essential to a distinct comprehension of the extent to which his admission went and what it covered. In no other way can the scope and precise import of the admission be satisfactorily brought out. And after all, will any real injustice be done by letting in all this evidence? Irrespective of it, and looking only to the brief of the evidence which was admitted, it seems impossible to reach any other fair conclusion than that Lybrend really had no case at all against this company, and that he brought an action which had no foundation in truth or justice. Nevertheless, he obtained a verdict, sought by perjury to sustain it, and afterwards, when driven to the wall, had to confess his perjury. Why should the rules of evidence be in the least degree strained in his behalf? If a liberal construction and application of them is ever to be permitted, is not this a case in which such a course is allowable? Courts should never lend themselves to a palpable defeat of justice, unless constrained to do so by unbending rules over which they have no control. We do not mean to say that inadmissible and irrelevant evidence ought ever to be admitted against a party over a proper objection; but we do mean to say that in a case like this, all material facts should be allowed to go in, unless absolutely forbidden by legal rules. As Lybrend himself, by making an improper and unconscionable effort to interfere with the due course of justice, has put the case in such shape that the full truth of it really material to the defense cannot be shown without at the same time showing other things not material, he cannot complain. The court in its charge can, as far as possible, protect him from any consideration by the jury

of the irrelevant facts; and if, because of the peculiar *status* of the case which he himself has brought about, the protection will not be adequate and complete, he has no one to blame but himself.

5. Many of the details of Lybrend's trip to Ohio and of his association with the woman Martha Comer certainly were irrelevant; but such facts as tended to show that she was upon the train of the Georgia railroad on the night he was expelled therefrom were, for a reason already stated, both relevant and material; and in view of the defendant's right, by a thorough and sifting cross-examination, to compel Lybrend to admit that she was upon that train, inquiries concerning his whereabouts and movements and the extent of his travels in company with the woman for some time previous, might have been legitimately pressed to a considerable extent, if counsel for the defendant had not encountered the difficulty which arose when Lybrend claimed his privilege as stated. He was protected under that clause of the bill of rights which declares that "No person shall be compelled to give testimony tending in any manner to criminate himself" (Code, §4998), and under section 3814 of the code, which provides that "No party shall be required to testify as to any matter which may criminate or tend to criminate himself, or which shall tend to work a forfeiture of his estate, or which shall tend to bring infamy, or disgrace, or public contempt, upon himself or any member of his family."

In arguing the case here, counsel for the company, recognizing the general rule upon this subject, contended that it should not have been applied in Lybrend's favor at the last trial of this case, because, at a previous trial, he had voluntarily testified as to the very matters concerning which he now chose to remain silent. In other words, that having once waived his privilege, the waiver was binding upon him until the case was finally at an end. We cannot concur in this view. The fact that Lybrend

had made the waiver at a former hearing before a different jury, and under circumstances necessarily to a greater or less extent unlike those surrounding the last trial, did not preclude him from exercising his privilege at a later stage of the case. He may, on one occasion, have had reasons for speaking out which were entirely satisfactory to himself; and on the next, he may have been influenced to keep silent by other reasons which were, in his opinion, equally cogent. These were matters for himself alone to determine. The privilege is in the highest degree personal, and is a sacred one which the courts should jealously guard. This case as to this point is widely different and easily distinguishable from that line of cases, practically without limit as to number, in which it has been held that if one on trial for crime chooses to testify in his own behalf, he must, on cross-examination, answer all pertinent questions, no matter if his answers do tend to criminate him. Ordinarily, the accused in a criminal case has no right to testify at all; and generally, if not universally, statutes conferring this privilege expressly, or in effect, annex as a condition that he must submit to the fullest cross-examination. He pays this price for the benefit of swearing for himself. We have in Georgia no statute allowing the accused in a criminal case to be sworn as a witness, and our statute allowing parties in civil cases to testify in their own behalf contains no condition in any manner abridging their rights or privileges as witnesses arising under our constitution or the above cited section of the code. It has, it is true, been very justly held that if a witness, being fully aware of his right to maintain silence, nevertheless voluntarily enters upon a partial disclosure concerning matters as to which he could claim his privilege, he will be deemed to have waived it, and may be compelled by a rigid cross-examination to disclose the whole truth regarding such matters. The reason of this rule is, that a witness cannot arbitrarily

in part waive, and in part reserve, his privilege for the purpose of becoming a partisan in the case, revealing only so much of the truth as will benefit one of the parties, and asserting his privilege when interrogated as to facts which would cut the other way.    In other words, if he elects to testify as to a given matter, he will, in the interest of justice and of right, be compelled to disclose the whole, and not a part only, of the truth.    There is, however, no necessity or reason for extending this rule to cover a case where a witness voluntarily testifies as to privileged matters upon one trial, and subsequently, at a second and entirely different trial, claims his privilege of giving no testimony whatever in regard thereto.    The second trial is a *de novo* investigation before another jury, whose duty it is to consider the case in the light only of the evidence adduced at that hearing; and to allow the witness to assert his privilege could result in no undue advantage or injustice to either party to the cause.    Considered merely as any other witness, Lybrend therefore had a right to claim his privilege at the last trial, notwithstanding the fact that at a previous hearing of the case he may have voluntarily waived it.

It was urged, however, that the waiver was binding upon him, because he was not simply a witness but a party to the case.    This cannot be a sound position.    A party often waives at one trial what he has an undoubted right to object to at a subsequent hearing of the same case.    For instance, he may permit irrelevant testimony to be introduced, or may allow the contents of a writing to be proved by parol without accounting for the paper, or he may allow an unrecorded deed to go in evidence without proof of its execution.    Surely, it cannot be said that because he does these, or similar things, at one investigation, he is until the end of that particular case estopped from making objections he had formerly chosen not to urge.    We therefore conclude that Lybrend's right as a witness to decline

answering the objectionable questions was not lost because, as a party swearing in his own behalf, he had on a previous trial answered similar questions without objection.

6.   We have not undertaken to deal specifically with all the questions made in the motion for a new trial, or in the cross-bill of exceptions filed by the defendant in error. Except as indicated in this opinion, there was no error which would have required a reversal of the judgment below; but if the trial judge had seen proper to grant a second new trial upon the merits, this course would have met the full approval of a majority of this court.

*Judgment on main bill of exceptions reversed.*
*On cross-bill affirmed.*

ATKINSON, Justice, dissenting.

1.   Where either party in a civil case is called as a witness in his own behalf, the adverse party is entitled to subject him to a cross-examination thorough and sifting; but he cannot, under the guise of a cross-examination, against a claim of privilege by the party examined, elicit from him testimony which may criminate or tend to criminate him, or which shall tend to work a forfeiture of his estate, or which shall tend to bring infamy or disgrace or public contempt upon himself or any member of his family; especially is this true, where the matter inquired of is collateral merely, or relates to irrelevant matters, or is not responsive to testimony delivered by the witness on his behalf.

2.   A witness may not be impeached by proof of contradictory statements previously made under oath touching immaterial matters and those not relevant to the issue being tried; and matters are neither material nor relevant when, under the pleadings and the evidence admitted thereunder, their admission in evidence could not legally aid in the solution of the questions raised.

3.   A party to a cause, sworn as a witness in his own behalf, is in like manner protected, and cannot be im-

peached by proof that in a former stage of the same cause
he had testified falsely as to matters touching his own con-
duct, concerning which, in the trial then in progress, he
exercises his privilege to remain silent, and which are not
relevant to the pending issue.

4. The fact that one party to a cause has wilfully man-
ufactured or suppressed testimony, or been guilty of any
other conduct therein which would indicate a purpose to
take an unfair advantage of his adversary, may be proved
at the trial to discredit the case of such party. Yet, where
the evidence offered to prove such facts, whether consist-
ing of documents or otherwise, contain some matters which
are wholly irrelevant, the court may, upon objection made
upon the ground of irrelevancy, exclude such testimony as
a whole from the consideration of the jury; and this is
true even though such documents or such testimony offered
may contain some evidence which might, under other cir-
cumstances, be relevant to the issue and admissible. The
duty of separating that which is relevant from that which
is irrelevant is upon the party offering the evidence, and
not upon the court.

5. Where at a former trial of the cause then being
tried, a party, who is a witness in his own behalf, makes
an affidavit and also delivers oral testimony touching mat-
ters concerning his own conduct, with respect to which,
during the trial then in progress, some of which matters are
relevant and some irrelevant, being again a witness on his
own behalf, claims his privilege of silence concerning such
matters, cannot be impeached generally by showing that he
had admitted that he "had sworn false in that affidavit," it
not appearing that the admission related to those things
which were relevant rather than to those which were irrele-
vant, nor is his former testimony, where it relates to mat-
ters wholly foreign to the controversy, admissible for any
purpose.

6. The verdict of the jury is supported by the evidence;

the charge of the court fully and fairly submitted the questions made by the pleadings; two juries have found in favor of the plaintiff, and no error of law having been committed, this court ought not to control the discretion of the trial judge in refusing a new trial.