FRANK WHITE v. NORFOLK AND SOUTHERN RAILROAD
                    COMPANY.

*Action for Damages—Common Carriers—Hiring Boat for
Excursion—Liability of Common Carriers to Passengers—
Wrongful Act of Servant.*

1. A common carrier has no power to relieve itself of liability to passengers simply by delegating its privileges to others, unless it has express authority, by statute, to lease its line and privileges.

2. Hiring a train for an excursion does not excuse a company for liability to passengers for injury caused by its servants; hence, where a railroad company, having by its charter the right to own and operate steamboats, chartered or hired a steamboat, manned by its own officers and crew, under its pay, to the managers of an excursion, it is liable for injuries to a passenger resulting from the negligence or wrongful act of its servants, unless it had transferred to the hirers the *exclusive* right to discharge the servants and employ others in their stead, and this is so, although the contract of carriage was between the passengers and hirers. *Semble*, that it might be different if the naked boat had been hired, without further stipulations.

3. In such case, it is immaterial whether the boat was chartered to run to points not on the regular lines of defendant company.

4. It is the duty of a common carrier not only to carry its passengers safely, but to protect them from ill treatment from its servants, other passengers and intruders and it is liable for an injury or ill treatment committed by its servants, whether in the line of their employment or not.

CIVIL ACTION, heard at Spring Term, 1894, of CHOWAN
Superior Court, by *Armfield, J.*, and a jury.

It was in evidence that the defendant owned several steamboats, fully manned and equipped, which it used in its business upon its regular line. That in July, 1893, defendant chartered one of these boats, the Mary E. Roberts, with its regular crew and equipment, to C. D. Morris and K. R. Ferebee, to run an excursion from Edenton to Nag's Head, leav-

ing on Saturday night and returning Sunday night, for the sum of $60. It was admitted that the route from Edenton to Nag's Head was not one of defendant's lines. That the crew on said boat were employed by the month by the defendant to run said boat, and in that way were paid for their services on said occasion by defendant. That the defendant had no control or direction of said excursion, or of said boat, except that it employed the said crew as aforesaid. The plaintiff bought a ticket for said excursion on the wharf at Edenton. It did not appear from whom, or by whom it was signed, which ticket was collected from him by the captain of the "Roberts" on said excursion trip. While on said boat returning from Nag's Head, near the engine-room, the plaintiff was struck by one Elliott, the engineer of the boat, near the door of the engine-room, and violently cursed. As soon as the officers of the boat heard of the trouble on board, they came down and ordered the engineer to the engine-room, where he remained till the end of the trip, but continued to abuse and curse the plaintiff. The engineer, at the time he struck plaintiff, said to him, "You are one of the parties making a disturbance on the boat," but White denied, on the trial of the case, that he did make any disturbance. It was in evidence that the said engineer was a competent and efficient officer, who had been in the service of the company for nine years, but that upon two occasions, while in its service, he had been on a spree, one of them being while he was engineer of a boat run by one of the officers of the "Roberts" on this excursion.

There was evidence by the plaintiff to show that Elliott was drunk at the time he had the trouble with plaintiff, and evidence to the contrary offered by defendant.

The Court stated that, in no view of the case, could plaintiff recover, and, in deference to this intimation, plaintiff submitted to a nonsuit and appealed.

It was alleged in the complaint, and admitted in the

answer, that defendant was, on the 15th of July, 1893, and now is, a corporation duly chartered under the laws of and doing business in North Carolina, as a common carrier of passengers, and that it did on the date stated, and does now, employ and use in prosecution of its business, besides its trains and engines, one or more steamboats.

*Messrs. W. M. Bond* and *J. H. Blount,* for plaintiff.
*Pruden & Vann,* for defendant (appellant).

MacRae, J.: The first contention of defendant is that it is in no event liable because the boat had been chartered by Morris & Ferebee for the occasion, and the contract of carriage was between the last named parties and plaintiff. And it is found in the case "that defendant had no control or direction of said excursion or of said boat except that it employed the crew as aforesaid." But the defendant is a corporation duly chartered under the laws of North Carolina and doing business as a common carrier of passengers, for the purpose of using not only its trains but one or more steamboats. One of these steamboats was *chartered* to Morris & Ferebee. The word chartered, as here used, means hired. The defendant, however, by virture of its franchise was the common carrier, and would have no power to relieve itself of liability to passengers simply by delegating its privilege to others.

It is upon the same principle that it has been so often held that unless there be express authority by statute to a railroad company to lease its line, the company is liable for the negligent acts of its lessee. See 2 Am. and Eng. Enc. of Law p. 756, where many authorities are cited. It will be seen, also, that this boat was hired fully manned by officers and crew in the pay of the defendant.

It cannot differ materially from the hiring of a train for the carrying of an excursion, where the contract of carriage

is made between the passengers and the hirers under whose direction the excursion is made. In the present case the boat was hired to run from Edenton to Nag's Head, and return, between certain hours. The defendant had no control or direction of the excursion or of the boat, except that it owned the boat and employed the crew. The crew, however, constituted the agency by which the boat was run. There might have been a distinction if the naked boat had been let to parties without further stipulation; but, here, the specific object of the excursion is stated in the contract and the servants of defendant directed to carry it out.

"Hiring a train for an excursion does not excuse the company from liability to the passengers for injury caused by their servants." 2 Redfield on Railways, 212. The case of *Skinner* v. *London Railway Co.*, is cited, where the declaration alleged that the plaintiff at the request of the defendants became a passenger in one of their trains to be carried, etc., for reward to them, etc.; that through the carelessness, negligence and improper conduct of the defendants the train in which the plaintiff was such passenger struck against another train, whereby the plaintiff was injured. At the trial it appeared that the train in question had been hired of the company by a benefit society for an excursion, the tickets for which were sold and distributed by the treasurer of the society from whom the plaintiff purchased one, and that the accident was occasioned by the train, in which the plaintiff was, running against a train standing at the station, it being then dark. One of the points made by defendants was, that there was no evidence that plaintiff was a passenger to be carried by defendants for hire. Upon this point Alderson, B., said : "The company by giving their tickets to the treasurer of the society to distribute, constitute him their agent to contract with those who take the tickets; at all events, that was a question for the jury."

The test in such a case as the present, is whether the defen-

dant abandoned the entire control of its servants, the master and crew of the boat, to the hirers. "If the hirer is vested for the time with the *exclusive* right to discharge the servants and employ others, he alone is responsible for their default." Shearman & Red. Neg., § 74, note I. The defendants hired to H. for a day a steamer and crew. The crew were hired and paid and entirely controlled by the defendant, who also had power to substitute others in their place. By the negligence of the crew an injury was occasioned to the plaintiff: held, that the defendant was liable, as the crew were its servants and not those of H. *Dolvell* v. *Tyser*, El. B. & L., 889.

In this instance, would the hirers have had the right to discharge the crew and employ others in their stead? Or did the defendant retain the authority to employ and discharge them? This contract of hiring is something like a charter party, in which the owner may either let the capacity or burden of the ship, continuing the master and crew in the employment, or he may surrender the entire ship to the charterer, who then assumes possession and control, and provides himself with master and crew. The first is a mere covenant for the performance of a stipulated service, and the owner is responsible, under such circumstances, for the conduct of the master and crew. 3 Am. and Eng. Enc., 144, note 6.

It is contended that, as the boat was chartered to run to points not upon defendant's regular lines, the defendant would not be liable under the facts of this case. We have held in *Washington* v. *Railroad*, 101 N. C., 239, that a common carrier, who entered into a *special contract* to transport passengers or freight to a point beyond its own line, which can only be reached by another line, thereby constitutes the latter its agent in the performance of the contract, and will be held liable for any damage resulting from the negligence of the agent. So we conceive that the liability of the defendant would not be affected by the fact that the boat

was chartered to run between points not upon defendant's regular lines.

It is contended, also, that there is a distinction between the liability of the master for negligence, and that for a wilful wrong committed by the servant. Upon this point, we have held in *Hussey* v. *Railroad*, 98 N. C., 34, that " the rights, the powers and the duties of corporate bodies have been so enlarged in modern times, and these artificial persons have become so numerous and entered so largely into the every-day transactions of life, that it has become the policy of the law to subject them, as far as practicable, to the same civil liability for wrongful acts as attach to natural persons, and this liability is not restricted to acts committed within the scope of granted powers, but a corporation may be liable in an action for false imprisonment, malicious prosecution and libel." Pearce on Railroads, 273.

We have endeavored to show, however, further on, that the liability of defendant arises here not for the negligence or wrongful acts of its servants, within the scope of their employment, but upon the distinct principle of its obligation to protect its passengers from insult or harm. This being the case, is defendant liable for the assault made by its engineer upon the plaintiff, a passenger? Whether this wrongful act was done by the engineer while acting within the scope of his employment is of no moment. The doctrine of *respondeat superior* is not involved. Its general principle is, that a master is liable for the act of his servant, done in the course of his employment about his master's business. But he is not liable for an act done outside of his employment, nor for the wanton violation of the law by him. Wood on Master and Servant, 552–559.

The liability of defendant here rests upon the obligation on the carrier not only to carry its passengers safely, but to protect them from ill treatment from other passengers, intruders, or employees. " Kindness and decency of demeanor

is a duty not limited to the officers, but extends to the crew."
Judge Story in *Chamberlain* v. *Chandler*, 3 Mason, 242.

"Passengers do not contract merely for shiproom and transportation from one point to another; they also contract for good treatment and against personal rudeness and every wanton interference with their persons, either by the carrier or his agents employed in the management of the ship or other conveyance. In respect to such treatment of passengers, not merely officers, but the crew, are agents of the carriers." See also 2 Wood Railway law, § 315.

"It is among the implied provisions of the contract between a passenger and a railway company that the latter has employed suitable servants to run its trains, and that passengers will receive proper treatment from them; and a violation of this implied duty or contract is actionable in favor of the passenger injured by its breach, although the act of the servant was wilful and malicious, as for a malicious assault upon a passenger, committed by any of the train hands, whether within the line of his employment or not. The duty of the carrier towards a passenger is contractual, and, among other implied obligations, is that of protecting a passenger from insults or assaults by other passengers, or by their own servants." Many authorities are cited to sustain this doctrine.

A very apt illustration of the distinction between the consequence to the master of the wrongful act of the servant done to one not a passenger, and to whom the master owed no duty, and an injury of a passenger by a servant, whether done within the scope of his employment or not, may be found in *Williams* v. *Pullman Co.*, 8 Am. St. Rep., 512.

We think there was error in the intimation of his Honor, and that the case should have gone to the jury.

New Trial.