M. D. HARRISON v. NORFOLK SOUTHERN RAILROAD COMPANY.

(Filed 20 September, 1922.)

**1. Carriers of Passengers—Railroads—Care for Passengers—Rules—Damages.**

It is the carrier's duty to its passenger to so enforce its reasonable rules of travel, that its employees will not subject the passengers to unnecessary assault, rudeness, or insult.

**2. Same—Assault—Abusive Language—Mental Suffering—Damages.**

Where the conductor of a carrier on a passenger train unnecessarily assaults, insults, and abuses a passenger, causing him personal injury and humiliation in the presence of his fellow-passengers, besides injuring his person, the passenger may recover damages for the injury to the person and to his feelings thereby caused.

**3. Carriers of Passengers—Railroads—Rules—Care for Passengers—Damages.**

It is a reasonable regulation of the carrier that its passenger occupy only the one seat for which he has paid, and it may in a proper manner enforce this rule without liability for damages, when the passenger has, in violation thereof, turned the back of the seat in front so that the seats faced each other, and reclined on one and placed his feet on the other.

**4. Same—Evidence.**

The plaintiff, in an action for damages against the carrier, was returning on the defendant's train from a city wherein he had undergone a surgical operation, and a fellow-passenger, seeing his weak condition, and to relieve his suffering, had turned two seats so as to face each other, so that the passenger could recline on one, with his feet on the other seat, seeing which, the conductor, in passing, suddenly and violently, and without notice, jerked the back of the seat whereon the plaintiff was sitting, causing him pain and suffering and the continued necessity for the injection of an opiate for several weeks. Upon evidence that the conductor

knew the plaintiff, and his then physical condition, and that he was informed thereof at the time: *Held*, the jerking of the seat was an assault upon the plaintiff by the defendant's conductor, for which the defendant was responsible in damages; and was also responsible for the insulting and abusive language he had used to the plaintiff in the presence of the other passengers in the coach, that was unnecessary under the circumstances.

**5. Appeal and Error—Instructions—Objections and Exceptions.**

An exception to a part of the charge of the judge containing several phases of the law upon the evidence, one or more of which is correct, will not be sustained on appeal, it being required of the appellant to point out the portion of the charge that he claims to be erroneous.

**6. Same—Briefs—Rules of Court.**

The appellant's brief must state the exception appearing of record he relied on, and assign the reason therefor, for the exception to be considered. Rule 34 (164 N. C., 551).

**7. Appeal and Error—Instructions—Objections and Exceptions—Damages.**

The charge of the court that the plaintiff in a personal injury case may recover, as the proximate cause of the defendant railroad company's negligence, for his pain, both physical and mental, is not objectionable as including "loss of bodily or mental power," of which there was no evidence, and will not be held for error when it correctly applies to a different element of damages.

**8. Evidence—Sufficiency—Appeal and Error—Actions.**

The plaintiff's evidence will be taken as true in passing upon the defendant's position that it was insufficient to prove his cause of action.

APPEAL by defendant from *Horton, J.,* at April Term, 1922, of WASHINGTON.

This is an action to recover damages for injuries to plaintiff, a passenger on one of the defendant's trains, caused by the acts and conduct of the conductor.

Plaintiff purchased a ticket from the defendant in Norfolk, Virginia, on 4 September, 1920, for transportation to his home in Roper, North Carolina, on the train known as "Norfolk-Belhaven train." This was the only train running from Norfolk direct to Roper. This train did not carry a Pullman or sleeping car, nor did any other train leaving Norfolk for Roper. Plaintiff left St. Vincent's Hospital on 4 September, where he had undergone a severe operation for stone in the kidney, having had an incision nine inches long and four inches deep made in his back. The wound was partially healed, and was not giving the plaintiff any pain when he was discharged from the hospital and told to go home, but to be careful. He was in a very weak and feeble condition, having been confined to his bed three weeks immediately preceding his discharge. This train, on which plaintiff was a passenger, was

crowded when leaving Norfolk, and plaintiff shared a seat with one Dr. Fields, who helped him to make his position comfortable, on account of the crowded condition of the train, by allowing him to lean against him in a reclining position. On arriving at Elizabeth City, the smoking compartment of the car where plaintiff had been riding was practically vacated, over one-half of the seats being left vacant. The plaintiff's traveling companion, Dr. Fields, pushed two seats together and told this plaintiff to lay in a reclining position to prevent his wound being aggravated, and thereby get more ease and comfort. Plaintiff had been in this position about ten minutes when the conductor came up behind him and suddenly snatched the back of the seat he was leaning against, saying in a rough and loud voice, "Get up from here," "Get up, we don't allow this." The doctor jumped up and said, "Hold on, conductor, this man has just been operated on, and is suffering. He has just left the hospital." The conductor replied, "I can't help that," and he (the conductor) snatched the seat back and went away saying, "Get over in the corner if you want to put your feet in the seat." It was testified that the seats in the corner were occupied by a passenger and filled with suit-cases. The plaintiff testified that when the conductor jerked the seat it dazed him and he was dumfounded; also, that he was humiliated by the rough and loud language used by the conductor. Other passengers in the car heard him. Plaintiff testified that he suffered great pain all the way to Roper, and that his suffering continued for about two weeks thereafter. That his wound was aggravated, he having to stand in the aisle of the car and recline on the arm of the seat, by the jerks and snatches of the train. Plaintiff testified further: "I had to stand up and sit on the arm of the seat, and anywhere else I could get ease in standing and reclining on the arm of the seat. My pain was aggravated by the train snatching me around. One-half of the seats in this compartment were vacant. When we got to Roper I was hurting pretty bad, and suffering a good deal, and nothing would help me but a hypodermic. This suffering continued about two weeks. I did not have any pain when I left the hospital. The reason I did not send for a physician, I knew he would give me a hypodermic and I had had a hundred already. The reason I did not take a sleeper, the sleeper leaves Norfolk at night, arrives at Mackeys about 2 o'clock in the night, and I would have to drive over the country roads four or five miles in a buggy or car to Roper. This is the only sleeping car leaving Norfolk for this county. They have a chair car on the train leaving Norfolk at nine, some time in the morning, for Mackeys." The conductor testified: "I have been employed by the Norfolk Southern for twenty years. I was raised in Roper and now live in Norfolk. I know Mr. Harrison,

the plaintiff in this action; know his family well.  The plaintiff Harrison was a passenger on my train in September, 1920, going from Norfolk to Roper.  I remember the day.  After leaving Elizabeth City, several of the seats were vacant, and he turned two seats facing each other, and I caused him to turn them back.  I don't remember offering him the opportunity to take other seats facing each other.  I don't think he made any complaint about not being able to find a seat.  I don't think I was rude to him or insulted him.  I remember when the plaintiff went to Norfolk.  I knew the plaintiff when I saw him, and when he went to Norfolk on my train he told me he was going for an operation.  I saw him on my train on 4 September returning from Norfolk.  I did not inquire about his physical condition.  I knew him as a boy.  I am 46 years old.  When I came back and found him lying in a reclining position, I knew he had been to the hospital.  I don't remember that I asked him how he felt, but when I saw his feet on the other side, I told him to get them off.  He is not the only one I have told so.  I tried to use good language; I do not use bad language.  I do object to people riding in the train and putting their feet all over the seats that other people have to sit in.  I didn't like to see seat hogs.  I like to see people respect the rights of others.  I don't recall or say that Mr. Harrison was a seat hog."

There was other evidence bearing more or less upon the case, but it is not necessary to state it, as that already set forth is substantially sufficient for an understanding of the questions presented.

The jury returned the following verdict:

"1. Was the plaintiff injured, humiliated, and insulted by the wrongful conduct of the defendant, as alleged in the complaint?  Answer: 'Yes.'

"2. If so, what damage, if any, is the plaintiff entitled to recover of the defendant?  Answer: '$1,000.' "

Judgment thereon, and defendant appealed.

*Van B. Martin for plaintiff.*
*Small, MacLean, Bragaw & Rodman and Z. V. Norman for defendant.*

WALKER, J.  In the consideration of this case, upon the facts disclosed by the pleadings and evidence, we may in the beginning refer to certain principles in the law of Carriers of Passengers which have been approved by this Court in *White v. R. R.,* 115 N. C., 631.  The Court there holds that the liability of the defendant rests upon the obligation of the carrier not only to carry his passengers safely, but to protect them from illtreatment of other passengers, intruders, or employees.  "Kindness

and decency of demeanor is a duty not limited to the officers, but extends to the crew." (*Judge Story,* in *Chamberlain v. Chandley,* 3 Mason, 242.) Passengers do not contract merely for ship-room or car-room and transportation from one point to another; they also contract for good treatment and against personal rudeness and interference with their persons, either by the carrier or his agents employed in the management of the conveyance. In respect to such treatment of passengers, not merely officers, but the crew, are agents of the carriers. 2 Wood Railway Law, p. 315. "It is among the implied provisions of the contract between a passenger and a railway company that the latter has employed suitable servants to run its trains, and that passengers will receive proper treatment from them; and a violation of this implied duty or contract is actionable in favor of the passenger injured by its breach, although the act of the servant was willful and malicious, as for a malicious assault upon a passenger, committed by any of the train hands, whether within the line of his employment or not. The duty of the carrier towards a passenger is contractual, and, among other implied obligations, is that of protecting a passenger from insults or assaults by other passengers, or by their own servants." Many authorities are cited (in *White v. R. R., supra*) to sustain this doctrine. And the following statement of the law relating to the rights of passengers and the duty and responsibilities of carriers has been sanctioned in this and in other jurisdictions. A common carrier is liable in damages to a passenger for an injury to his feelings caused by the insulting, indecent, or abusive language, or indecent or insulting conduct of its employees, whether conductors, motormen, ticket agents, or other employees, upon the ground of a breach of its contract which obligates it not only to safely transport the passenger, but to accord to him respectful and courteous treatment, and to protect him from insult from strangers and its own employees. And the rule applies, although the carrier does not authorize or ratify such conduct, and was not negligent in selecting the employee. . . . The obligation of a carrier to use due diligence through its servants to protect its passengers from injury and abuse is equivalent to a guaranty that such injury and abuse shall not come from its servants themselves. A carrier is absolutely liable as an insurer for the protection of passengers against assaults and insults at the hands of its servants, unless the passenger alone is the cause of the trouble. . . . The duty of a carrier to carry passengers safely and expeditiously, and to conserve, by every reasonable means, the convenience, comfort, and peace of the passengers, rests on its agents, who must protect each passenger from bodily discomfort, insult, indignities, and personal violence, and the carrier is liable because of a violation of the duty he owes to passengers. Moore on Carriers, vol. 2, p. 1175, and cases to be found in the notes.

It was said in *Rose v. R. R.,* 106 N. C., 168, 171: "A railway company cannot be held liable to answer in damages because its servant, who is required to collect fares and protect it against imposition by expelling those who have not paid in the time that elapses between stations that are often but a short distance apart, informs a husband in a brusque manner, in the presence of his wife, whose head is resting on a pillow, that they must pay or get off, and, after waiting until the train reaches the next station, says, in a decided or rude tone, that they must get off. The language was certainly such as was the right, if not the duty, of the conductor to use, and the defendant cannot be held responsible for his failure, in the hurry of the moment, to modulate his voice so as to make it soft or gentle, especially when he was giving a command in the line of his duty, which the plaintiffs had shown themselves loath to obey."

There may appear to be some conflict between *Rose v. R. R., supra,* and the other authorities, including the case of *White v. R. R., supra,* but we deem it more apparent than real. In the *Rose case,* the plaintiffs were loath to obey the conductor's command to pay their fare, or get off the train. They did not comply with his demand for the fare, which he had made at first, in a proper tone and respectful manner, and without rudeness of conduct or brusqueness of behavior. As they still defied him up to the time they reached the next station, he then, using a more "decided or rude tone," told them, "You must get off here." The conductor, in that instance, was considerate and even courteous, until the situation required that he should be more peremptory. This change of manner or tone of voice on his part, and his general demeanor, under very trying and aggravating circumstances, seems to have been justified, or, at least, provoked by the inexcusable conduct of the two passengers, who should have known the rule or regulation of the carrier, and willfully refused or failed to comply with it. That case and this one are quite different, for here the plaintiff did nothing which should have aroused the anger of the conductor and caused him to act not only in a rude and insolent manner, but, on the contrary, the plaintiff was guilty of no willful misconduct, but only of a technical violation of a rule by resting his feet on the seat in front of him so that he could recline on his own seat and thus rest and ease his wounded body. A mere suggestion from the conductor, made in a moderate or usual tone of voice, would have accomplished his object and enforced the rule, if it existed, there being no evidence of it save what may be inferred from the remark the conductor made when he rudely and violently ordered the plaintiff to remove his feet from the opposite seat. But the jury could have found from the evidence that the conductor did more than this, and that

he committed an assault upon the plaintiff, when he, not only peevishly and petulantly, but violently, jerked the seat on which he was reclining and compelled him suddenly and without any warning to sit upright, which caused him to suffer pain and discomfort, owing to the suddenness of the unexpected command, and particularly by the violent jerking of the seat which forced the plaintiff to do so. But this is not all, as the conductor admitted in his testimony that he knew of the plaintiff's weak and feeble condition consequent upon the severe and serious operation which had been performed but a short while before, as he had been told by the plaintiff, while on his way to the hospital to have it done, what was the object of his visit to Norfolk. If such a rule of the company had been adopted, as is now relied on, and was a reasonable one, it certainly was not intended to be enforced in such a harsh manner, especially so under the circumstances. There seems to have been no occasion for it, as there were vacant seats in the coach, and no passenger was put to any inconvenience or discomfort by the plaintiff's using the two seats as he did. Plaintiff testified that he suffered so much physical pain afterwards, and for two or three weeks, that he was compelled to use injections of morphine to relieve his suffering, and this was not good for him, as he had taken one hundred in the hospital, and wished to avoid the further use of it. We cannot well account for the rudeness of the conductor's language and manner of addressing the plaintiff, nor the brusqueness of his behavior, to state it mildly, when more moderate and temperate language and conduct on his part would have fully sufficed for his purpose. We follow *Rose v. R. R., supra,* it being a correct statement of the law as applied to the facts of that case, but it clearly does not govern here, upon quite a different state of facts. It was held in *Cole v. Atlanta, etc., R. R. Co.,* 102 Ga., 474, that mere rudeness of language or brusqueness of behavior on the part of the servant will not be such an injury to the passenger as to entitle him to recover damages. Of course, if the servant of the carrier acts only in justifiable self-defense, as against an assault by the passenger, the carrier will not be liable; but no provocation, consisting in mere insulting language, will excuse an assault, nor will the fact that the passenger is refusing to comply with a regulation of the carrier justify the servant in using violence not proper nor necessary for the enforcement of the regulation. If the conductor, without provocation, uses opprobious words and abusive and offensive language, tending to cause a breach of the peace or to humiliate the passenger, and adds force or violence to it, and subject him to mortification, the carrier is liable in damages. But, in our case, more than this was done, as the plaintiff by the unnecessary rough handling of the conductor was made suddenly to change his posi-

tion without notice of the intention of the conductor, when milder action on the latter's part, and mere notice to the plaintiff, or a simple request from the conductor, would have produced the desired result. We conclude that the evidence in this case brings it within the rules of the law as formerly stated by us.

While a carrier may make reasonable regulations as to the conduct of its business and the running of its trains, this Court has said that "the authorities are to the effect that a degree of attention beyond that due to ordinary passengers should be bestowed on those affected with a disability by which the hazards of travel are increased; the sick, lame, and infirm are entitled to more care and attention from those in charge of a car than those in full possession of their strength and faculties." *Clark v. Traction Co.,* 138 N. C., 82; *Croom v. Railroad,* 52 Minn., 296; *Sheridan v. Railroad,* 36 N. Y., 39. Plaintiff said that the jerk of the conductor was so violent that it dazed and "dumfounded" him, and that he was hurt and greatly humiliated by his conduct and the indignity he put upon him, as the passengers saw and heard what took place. For these wrongs he was entitled to recover damages, which could embrace his mental suffering and humiliation and other compensatory damages.

The defendant complains that the court charged the jury that, as a part of the damages, they could award compensation "for the loss of both bodily and mental power," whereas there was no evidence of such loss. The exception was taken to the entire instruction on damages, which was composed of several elements, that quoted above being but one of them. The court certainly stated some of the elements correctly, and in such a case the appellant is required to be more definite in his exception, and to point out the particular part of the instruction alleged to be erroneous, and in his brief he must state the exceptions in the record on which he relies, and assign the reasons therefor, otherwise they will be deemed as abandoned. Rule 34 (164 N. C., 551). The only part of the exception reserved in the brief is this: "The court charged the jury that the plaintiff was entitled to recover for all pain he had suffered, both mental and physical," but this is far from including "loss of bodily and mental power," and refers to a different element of damages; so that even if there was no evidence of such a loss, the defendant cannot avail itself of it under the rule of this Court. We do not say that there was such evidence, and are not required to say so.

The fault of the conductor was in coming up behind the plaintiff and rudely and roughly "snatching his seat," so that he was compelled, in his weak and feeble condition, to change his position suddenly, and, necessarily, with pain and discomfort to him, and this the conductor must have known, or should have known, from what he admitted in his own

testimony as to his seeing the plaintiff on his way to the hospital to undergo a severe operation and knowing his then condition. It does not appear that any passenger needed the seat occupied by the plaintiff, as there were vacant seats in the car, nor does it appear that plaintiff's use of the seat was, in any way, actually injurious to it, or left it uncleanly, so as to prevent its convenient and comfortable use by others. Rules and regulations of the company should not only be reasonable in themselves, but enforced reasonably, and not with excessive rudeness and violence. "If an unattended person who is so sick, aged, or otherwise infirm as to be unable to assist or care for himself, be accepted as a passenger (as was done here), the carrier, if he has notice of the passenger's condition, is bound to exercise for his safety a degree of care commensurate with the responsibility assumed, and that would be such care as would be reasonably necessary to protect him from injury in view of his physical or mental condition." 2 Hutchison on Carriers, p. 1140.

"While as a general rule a carrier of passengers is not bound to anticipate or to guard against an injurious result which would happen only to a person of peculiar sensitiveness, yet there are numerous decisions to the effect that a sick or aged person, a delicate woman, a lame man, or a child, or one not in full possession of his faculties, is entitled to more attention and care from a carrier than one in good health and under no disability, and that where physical or mental weakness or disability is apparent to, or is brought to the attention of the carrier, the high degree of care which the law imposes upon him requires the carrier to take notice of the disability and conduct himself accordingly." 4 R. C. L., sec. 594.

Here the conductor knew of plaintiff's condition, when he first saw him, and must have known that he had just submitted to a severe operation before he entered the car. If not, he was immediately notified by Dr. Fields of his serious and weakened condition. In *Weighman v. Railway Co.,* 70 Miss., 563, it was held that the carrier, after having been informed of the passenger's condition, was bound to treat him humanely and with consideration; that while it was not bound to receive the passenger in such condition upon its train, yet having done so with knowledge of his disability or of his inability to care for himself, it was liable for having failed to exercise due care to protect him from injury.

We must not be understood as holding, in this case, that a carrier may not limit a passenger to a single seat, so that he will not occupy more room than he has paid for, because such a rule would be reasonable, but it must be enforced reasonably and with due regard to the dictates of humanity, so that the passenger may be accorded proper and respectful treatment, and not be unnecessarily injured by excessive force

applied in attempting to compel obedience to the rule, and surely so, where a simple request from the conductor, it appears, would have been sufficient, in the particular instance, to accomplish the end in view. There was, here, not even a plausible excuse for supposing that such a request would not have been instantly complied with, and we may safely venture to assert that no carrier would have complained of its conductor if he had waived the technical violation of the rule in this case, under the circumstances, which were known to him. Still, the rule was a valid one, and the fault is all with the manner of its enforcement, and the consequent physical, and even mental, injury to the plaintiff, for it was calculated to humiliate him, in the presence of the other passengers, besides causing him pain and suffering. Surely the law does not permit or sanction such conduct as that of the conductor when, as it appears, other and milder methods were plainly open and available to him.

We must accept the plaintiff's evidence as true in deciding the question whether he has offered any to prove his cause of action, and thus considered, we are of the opinion that there was some evidence for the jury, and it appears from it that the conductor enforced the rule, if one existed, with undue severity, under the circumstances, and so as to give plaintiff a right to this action for the wrong.

There was no error in the trial of the case, and we must, therefore, affirm the judgment.

No error.