# NANA L. COZINE *v.* HAWAIIAN CATAMARAN, LTD.

## No. 4463.

FEBRUARY 21, 1966.

CASSIDY, ACTING C.J., WIRTZ, LEWIS AND MIZUHA, JJ.,
AND CIRCUIT JUDGE DOI ASSIGNED BY REASON
OF VACANCY.

OPINION OF THE COURT BY LEWIS, J.

Plaintiff was injured on September 24, 1959, when she was struck on the head by the falling mast of a catamaran, owned and operated by defendant for the carriage of passengers for hire. At the time, plaintiff was cruising offshore, after boarding at Waikiki beach as one of a party of six for whom plaintiff's husband had booked the catamaran ride. There was a two-man crew, of which one was the skipper.

Alleging negligence and incompetence of defendant in the operation and maintenance of the catamaran, plaintiff sued for damages for her injuries and was awarded general damages of $12,750 by the verdict of a jury. Special damages were disallowed by the court on the ground that the expenses involved were those of the husband, who had withdrawn his claim.

## Res Ipsa Loquitur

Upon this appeal from the judgment, defendant specifies as Error No. 18 the giving of a *res ipsa loquitur* instruction, contending the doctrine was inapplicable and in any event the instruction was improperly phrased. We first consider the applicability of the doctrine.

When the case went to the jury, the record showed that the catamaran was built in 1954, that it had a single mast 20-25 feet high and 8-10 inches in diameter at its base, and that the mast snapped slightly above its base as the catamaran was executing a turn in weather which the jury could have found was not unusual, with a wind velocity of four knots per hour and moderate seas. When plaintiff's witness, a former employee of defendant, though not a member of the crew, went aboard half an hour after the catamaran was towed in, he observed external cracks on a swage fitting in the rigging, and the wire was separated from the fitting; the particular fitting which was in this condition was not identified. As shown by another

witness, defendant's expert hereinafter mentioned, a swage fitting is a terminal connection for a piece of wire rope, having a tube. A wire is inserted in the tube, and the tube squeezed under pressure around the wire.

According to plaintiff's witness, the former employee above-mentioned, defendant's practice was to drydock its vessels every six months, "mostly for hull work—damage to the bottom," and to visually inspect the standing rigging; how often inspection was made was not specified. "* * * [F]ittings are the main thing," according to his testimony. He further testified that there was "some but very little" preventative maintenance, by which he said he meant "changing standing riggings after so many years"; how often riggings should be changed was not specified. Over objection, this witness was permitted to testify that the general condition of this catamaran was "very poor," and that "everything was run down and everything was worn out." Specification of Error No. 8 asserts that such evidence was irrelevant to the particular situation at issue, but we do not so regard it.

Defendant's expert, a marine engineer and naval architect, testified that swage fittings fail for a number of reasons; that a defective condition can be ascertained by normal inspection before failure of the fitting; that this is not invariably the case, and a crack might be invisible prior to failure of the fitting though visible afterward, but "that would not normally be the case." Wires may break, a principal reason being fatigue failure which is very difficult to detect beforehand. He testified that the most common cause of mast failures is failure of the rigging, but the mast may break without failure of the rigging, due to defects in the mast itself, in the wood, which might or might not be detectable in a finished mast. This witness further testified that a catamaran has about eighteen fittings in the standing rigging, and that one

could not say whether failure of a fitting would cause the mast to break without identifying the fitting that failed.

As to maintenance practices, defendant's expert testified that in normal use a pleasure boat is drydocked every eight months, though six months is "quite common if you're trying to get best speed," that as to checking on the standing rigging "a normally prudent fellow" would make a visual inspection every two or three months, and that for prudent practice the riggings should be renewed every ten years—"It isn't done, but it should be."

The doctrine of *res ipsa loquitur* applies "whenever a thing that produced an injury is shown to have been under the control and management of the defendant and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised * * *." *Ciacci* v. *Woolley,* 33 Haw. 247, 257, quoting from *Morgan* v. *Yamada,* 26 Haw. 17, 24.

Defendant would state the rule in the terms of *Lyu* v. *Shinn,* 40 Haw. 198, 202, and would have the court hold the doctrine inapplicable, in the absence of expert testimony, "where the common knowledge or experience of men is not extensive enough to permit it to be said that the plaintiff's condition would not have existed except for negligence of the person to be charged." But the court there was discussing the applicability of the doctrine in malpractice suits where, as stated, citing *Ewing* v. *Goode,* 78 Fed. 442, 443: "If * * * a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon * * * few would be courageous enough to practice * * *." And the court expressly stated that it was "clearly preferable, for reasons of public policy (*Ewing* v. *Goode, supra*), that a malpractice suit be placed upon [a] singularly divergent principle, and that to apply the doctrine the circumstances are required to be such that laymen (as distinguished from physicians

and surgeons) are able to infer from the facts without the aid of expert medical testimony that an act or acts of misfeasance or nonfeasance had been committed or omitted." (40 Haw. at 204.)

It requires no expert testimony to enable a jury to infer that in the ordinary course of events and if due care is used the mast of an excursion boat does not snap off, otherwise the patrons of such boats would be few. Plaintiff rightly contends that the status of defendant as a common carrier has bearing. See 14 Am. Jur. 2d, *Carriers,* § 1154 at 566. An excursion boat operated for hire is a common carrier of passengers.[1] Of such a carrier, it has been stated, a high degree of care is required. *Loc-Wood Boat & Motors, Inc.* v. *Rockwell,* 245 F.2d 306, 309 (8th Cir.), *affirming In re Wood's Petition,* 145 F. Supp. 848, 857 (W.D. Mo.); *Morrison* v. *Coombs, supra,* 23 F. Supp. 852 (D. Me.), *aff'd on rehearing,* 24 F. Supp. 366. It is argued that the rule requiring a high degree of care is not applicable, since the carrier operates on the navigable waters within the admiralty jurisdiction of the United States.[2] However that may be, we are concerned at this

---

[1] We note that all of the passengers were members of the party for whom plaintiff's husband had booked the catamaran ride. However, a vessel does not take on private carrier status because booked on the particular occasion for passengers constituting members of a group. *Morrison* v. *Coombs,* 23 F. Supp. 852 (D. Me.) *aff'd on rehearing,* 24 F. Supp. 366; *White* v. *Norfolk & S. R.R.,* 115 N.C. 631, 20 S.E. 191. *Kaili* v. *Inter-Island Steam Nav. Co.,* 25 Haw. 777, is cited by plaintiff for this proposition, but the point was not in contest there.

[2] *Kermarec* v. *Compagnie Generale Transatlantique,* 358 U.S. 625 (1959), is cited in support of this argument. 1 Edelman, *Maritime Injuries and Death,* 239-41, suggests that *Kermarec* has changed the rule in maritime injury cases. However, the federal cases decided since *Kermarec* continue to state the rule as to the care owed by a common carrier to a passenger for hire in the same terms as before, *e.g., Moore-MacCormack Lines, Inc.* v. *Russak,* 266 F.2d 573 (9th Cir. 1959); *McCormick Shipping Corp.* v. *Stratt,* 322 F.2d 648 (5th Cir. 1963); *Stanga* v. *McCormick Shipping Corp.,* 268 F.2d 544, 551 (5th Cir. 1959); *but cf., Fidelity & Cas. Co. of New York* v. *C/B Mr. Kim,* 345 F.2d 45 (5th Cir. 1965). See *Talton* v. *United States Lines Co.,* 203 F. Supp. 17 (S.D.N.Y. 1962), citing *Kermarec* on the question of the applicability of the seaworthiness doctrine while at the same time recognizing the

time, not with the degree of care owed by a common carrier to a passenger but instead with the operation of the rule of *res ipsa loquitur*. This being a procedural matter State law governs under the general rule stated in *Madruga* v. *Superior Court,* 346 U.S. 556, 561. No national policy precludes us from permitting an inference of negligence under the circumstances presented. We conclude that, in an action by a passenger for hire against a common carrier, when it is made to appear that the accident was caused by an equipment failure and the equipment was under the carrier's control, it is sound principle to shift the burden of going forward with the evidence from the passenger to the carrier, or at least put upon the carrier the risk of a verdict against it. Under this rule, if the cause of the equipment failure remains undetermined the case will be permitted to go to the jury on the basis of the evidence that the accident was caused by the failure of equipment under the carrier's control. We ap-

---

high degree of care owed a passenger. And see *Rechany* v. *Roland,* 235 F. Supp. 79, 84 (S.D.N.Y. 1964), stating that: "A ship's officers have a high duty of care for the safety of passengers."

*Kermarec* was construed in *Jones* v. *United States,* 362 U.S. 257, 266, as having held that there was "a duty of ordinary care to one rightfully on the ship, regardless of whether he was a 'licensee' rather than an 'invitee.'" That is all that was involved in *Kermarec.* In leading off the discussion of the point in *Kermarec* the Court stated at 630 of 358 U.S. that: "It is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." That was not appropriate language to overrule the Court's previous construction of the nature of a water carrier's obligation to a passenger under the contract of carriage. As early as 1879 the Court had stated in *The "City of Panama,"* 101 U.S. 453, 462:

"Passengers must take the risk incident to the mode of travel which they select, but those risks in the legal sense are only such as the utmost care, skill, and caution of the carrier, in the preparation and management of the means of conveyance, are unable to avert."

It is probable, therefore, that in concluding that "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case," the Court in *Kermarec* did not intend to alter the rule as to the duty owed passengers carried by a common carrier for hire.

ply the rule here.[3] *Cf., Eagle Packet Co.* v. *Defries,* 94 Ill. 598; *Yerkes* v. *Keokuk Northern Line Packet Co.,* 7 Mo. App. 265; *McBride* v. *McNally,* 243 Pa. 206, 89 Atl. 1131.

It is argued that the record shows that the accident could have happened without negligence on the part of defendant. Applicable here is the principle that: "The rule of *res ipsa loquitur* * * * means that 'the facts of the occurrence warrant the inference of negligence, not that they compel such an inference.'" *Johnson* v. *United States,* 333 U.S. 46, 48; *accord, Lang* v. *Puget Sound Nav. Co.,* 189 Wash. 353, 356-58, 65 P.2d 1069, 1071. *Ciacci* v. *Woolley, supra,* 33 Haw. 247, 259, is authority on this point. There was enough evidence in the present case to take the case to the jury. Perhaps less would have sufficed. Defendant's insistence that a full explanation of the accident be produced in order for the case to reach the jury, if acceded to would negate the doctrine of *res ipsa loquitur* altogether.

In submitting the case to the jury the court instructed the jury, over defendant's objection, that:

"The doctrine, *res ipsa loquitur,* asserts that whenever a thing that produced an injury is shown to have been under the control and management of the Defendant and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of the injury itself will be deemed to afford sufficient evidence to support a recovery, and the Defendant will be presumed to be negligent in the absence of any explanation by the Defendant tending to show that the injury was not

[3] When plaintiff is a passenger for hire and defendant is a common carrier this situation, according to some authorities, calls for more than an inference of negligence. See Prosser, *Res Ipsa Loquitur in California,* 37 Calif. L. Rev. 183, 185-87, 222; Prosser, *Torts,* § 43, at 213-14 (2d ed. 1955). We do not go that far, holding only that an inference of negligence is warranted.

due to his want of care. If you believe from the evidence that the accident complained of in this case falls within the definition of accidents defined in the phrase *res ipsa loquitur,* I instruct you that it is not necessary for the Plaintiff to prove negligence on the part of the Defendant by direct evidence of such negligence."

Defendant objected not only to the applicability of the doctrine of *res ipsa loquitur* but also that "the instruction, in any case, is improperly phrased." Plaintiff, who had offered the instruction as plaintiff's requested Instruction No. 6, insisted that: "This is the exact wording of the case taken right from the book," and the court thereupon ruled.

From plaintiff's brief it appears that the case to which plaintiff's counsel had reference was *Ciacci* v. *Woolley, supra,* 33 Haw. 247, 263. There the instruction approved by the court in overruling defendant's exception nine was as set forth in the note,[4] from which it appears that the first paragraph of the instruction approved was substantially different from the first part of the one given here. This first part was taken from the court's discussion of the *res ipsa loquitur* doctrine at pages 257-58, which was referred to at page 263 as supporting the instruction there under review without setting out the exact language.

[4] Instruction approved by the court in *Ciacci* v. *Woolley, supra,* 33 Haw. 247, 263, in overruling defendant's exception nine:

"I instruct you, Gentlemen of the Jury, it is not necessary for plaintiff to produce direct evidence of negligence on the part of defendant in connection with the accident resulting in his injuries, where by reason of the nature of the accident negligence may be inferred from the accident itself. Such accidents fall within the phrase *res ipsa loquitur,* which literally translated means 'the thing speaks for itself' and include all accidents where the circumstances attendant upon them are of such a character as to justify a jury, on the basis of their experience as men of the world, in inferring negligence as the cause of the accident.

"If you believe from the evidence that the accident complained of in this case falls within the definition of accidents defined in the phrase *res ipsa loquitur,* I instruct you that it is not necessary for plaintiff to prove negligence on the part of defendant by direct evidence of such negligence."

This is another instance in which an instruction has been framed from the words of an opinion, a practice against which we have warned counsel. *Territory* v. *Cutad,* 37 Haw. 182, 186;[5] *State* v. *Evans,* 45 Haw. 622, 636, 372 P.2d 365, 374; *State* v. *Clyde,* 47 Haw. 345, 357, 388 P.2d 846, 853. Moreover, the words "and the defendant will be presumed to be negligent" were introduced in a sentence copied into the instruction, which was from a portion of the opinion in *Morgan* v. *Yamada, supra,* 26 Haw. 17, 24, quoted in *Ciacci.* However, the opinion in *Morgan,* as quoted in *Ciacci,* does speak of a "presumption" having the significance that "the plaintiff has made out a *prima facie* case which entitles him to a favorable finding unless the defendant introduces evidence to meet and offset its effect."

It would serve no purpose to scrutinize at length the language used in the opinions of this court to ascertain whether the word used in speaking of the *res ipsa* doctrine's effect was "presumption" or "inference." We here are dealing with the form of an instruction. The important point is the preservation of the province of the jury. If the case is one in which there is a choice to be made between conflicting inferences as to which reasonable men may differ the jury should be instructed in such manner as to leave to them that choice. Prosser, *Res Ipsa Loquitur in California, supra,* 37 Calif. L. Rev. 183, 217-21. As was stated in *Guanzon* v. *Kalamau,* 48 Haw. 330, 335, 402 P.2d 289, 292, note 3, an instruction covering the doctrine of *res ipsa loquitur* should permit, but not compel, an inference of negligence. On the other hand, if the evidence is such as to compel an inference of negligence the court should deal with it as in any other situ-

---

[5] In *Cutad* the court, quoting from *Garfield* v. *State,* 74 Ind. 60, 63, stated: "It is not every statement of the law found in a text-book or opinion of a judge, however well and accurately put, which can properly be embodied in an instruction. * * *"

ation where the court deems that reasonable men could reach only one conclusion, and should direct a verdict unless there are other issues for the jury such as contributory negligence or proximate cause.

In a case in which the court deems the inference of negligence permissible but not required it will be for the jury to determine whether to make it. If the jury makes the inference, that is tantamount to a finding of negligence. Of course, if the jury finds the accident explained in terms other than a want of the required care on the part of defendant, there will no longer be room for an inference of negligence. *Guanzon* v. *Kalamau, supra,* 48 Haw. 330, 402 P.2d 289.

Here the evidence did not compel an inference of negligence. Error occurred from the use of the words "will be presumed," but it does not necessarily follow that it was reversible error. We must consider the charge as a whole. *State* v. *Shon,* 47 Haw. 158, 168, 385 P.2d 830, 837; *Ciacci* v. *Woolley, supra,* 33 Haw. 247, 260-62. According to the instruction, negligence "will be presumed" only if the jury "believe from the evidence" that the occurrence was such "as in the ordinary course of events does not happen if due care has been exercised." Thus the point in dispute under the evidence was left to the jury. At defendant's request the jury specifically was instructed that it was for the jury to decide certain points, among them whether "it is a matter of common knowledge that the accident in question is of a kind which ordinarily does not occur in the absence of someone's negligence." Also that: "If you find that the conditions which I have just described do exist in this case, then you may infer that some negligent conduct on the part of the Defendant was a proximate cause of the accident."

While there was no specific instruction that the jury was not required to arrive at an inference of negligence,

that was the net result. Not only was it left to the jury to decide whether the accident was one which ordinarily would not occur unless there was negligence, but also the jury was directed, by the very instruction objected to, to consider "any explanation by the defendant tending to show that the injury was not due to his want of care." Only in the absence of such explanation would negligence be presumed, even though the jury was convinced that the accident would not ordinarily occur unless there was negligence, according to the instruction. So, if the jury deemed the testimony of defendant's expert explanatory in nature (instead of as striking at the application of the *res ipsa* doctrine) that point was covered also. This is not a case of irreconcilable conflict in the instructions, such as would preclude an affirmance. *Compare Borowsky* v. *Honolulu Rapid Transit Co.,* 29 Haw. 188, 199, *with Ellis* v. *Mutual Telephone Co.,* 29 Haw. 604, 613-14, and see the explanation of the test of prejudicial error in *Kealoha* v. *Tanaka,* 45 Haw. 457, 463, 370 P.2d 468, 472; *State* v. *Yoshida,* 45 Haw. 50, 64, 361 P.2d 1032, 1040.

Defendant cites *Holley* v. *Purity Baking Co.,* 128 W. Va. 531, 538-39, 37 S.E.2d 729, 733, as a case in which prejudicial error was found. However, in that case the jury was instructed that if plaintiff's injuries were proximately caused by a small metallic substance in a cake made by defendant which plaintiff attempted to eat, "the prima facie presumption of law is that said defendant was guilty of negligence." Moreover, the case was not submitted to the jury in terms permitting the jury to decide whether the accident was of a kind which ordinarily does not occur in the absence of someone's negligence. We deem this case distinguishable.

There is a further point to be considered. As seen, defendant made only the general objection that Plaintiff's No. 6 was "improperly phrased." Though the court seems

to have ruled without awaiting a specific statement as to the phraseology objected to an opportunity still remained for a clarifying instruction, if one was needed. *Cf., State v. Arena,* 46 Haw. 315, 335, 379 P.2d 594, 606; *Ginoza v. Takai Elec. Co.,* 40 Haw. 691, 710-11; *Territory v. Furomori,* 20 Haw. 344, 350; *Sylva v. Wailuku Sugar Co.,* 19 Haw. 602, 609. There was no request for an instruction that the jury was not required to find negligence. Defendant merely offered its own requests in the form originally tendered, and requested reconsideration of the court's ruling on Plaintiff's Nos. 6 and 7, as a result of which No. 7 was refused.[6]

We have concluded that in the absence of a specific objection and taking the instructions as a whole, the use of the words "will be presumed" instead of "may be inferred" in Plaintiff's Instruction No. 6 did not constitute reversible error.

### Testimony of Defendant's Expert

We now will consider the limitations put upon the testimony of defendant's expert, Mr. Simmerer, the marine engineer and naval architect above mentioned. This witness, though permitted to testify as an expert on a number of points as has been set out, was not permitted to answer a hypothetical question the purpose of which was, as shown by the offer of proof, to include all the facts shown relative to the accident, and then elicit the witness' opinion that "mast failures of the kind disclosed in the evidence in this action commonly occur without any negligence on the part of the owner or operator of the vessel," and "the balance of probability is very heavily in favor of an inference that the mast failed because of any one

---

[6] Plaintiff's No. 7 would have instructed the jury that a presumption is a conclusion which the law requires from particular facts, and which continues in effect unless outweighed by convincing evidence to the contrary.

of several possible latent defects which would not have been discoverable upon reasonable inspection."

This line of questioning was not permitted, on the ground of the witness' "lack of familiarity with catamarans and their sailing peculiarities." In rejecting the offer of proof, the court ruled "that Mr. Simmerer is a naval architect but is not an expert as to catamarans." Plaintiff argues that this ruling was within the trial court's discretion as to the qualifications of an expert witness, which discretion we recently have reaffirmed. *Bulatao* v. *Kauai Motors, Ltd.,* 49 Haw. 1, 406 P.2d 887, *rehearing denied,* 49 Haw. 42, 408 P.2d 396.

The question here is as to the witness' qualifications to answer a particular question. The witness satisfied the court in a lengthy examination out of the presence of the jury that he was qualified to answer questions concerning mast failures and concerning fittings, generally. The court stated: "I find Mr. Simmerer to be a fine naval architect, but not qualified to answer this particular question. * * * He's competent to talk about fittings and he's competent to talk about masts. I say he's incompetent to answer this particular question." The court stated the view that this particular question concerned the sailing characteristics of catamarans, as distinguished from sailboats of the ordinary type. Plaintiff argues that this is correct, because the proposed hypothetical question incorporated the proposition that the mast snapped "while the boat was turning."

After careful review of the record we are unable to see wherein the question at issue required special experience in the maneuvering of catamarans. While the point may not have been clear up to the time when the offer of proof was made; it then was made clear that defendant's question was directed to the possibility that a latent defect caused the mast failure. The witness was qualified

on that point, under the court's own ruling. Under that ruling the witness did, in fact, testify at length as to the many causes of mast failures. However, he did not evaluate the likelihood of a latent defect, as against one discoverable by reasonable inspection, in the terms desired by defendant.

Plaintiff contends there was no prejudice, also that the hypothetical question did not contain sufficient facts to enable the witness to form an opinion as to the cause of the accident. Prior to the ruling on the offer of proof there was some colloquy on the form of the hypothetical question, the court at that time making the additional ruling that the hypothetical question as then stated was incomplete, and defendant taking the position that "there aren't any more facts," and that it was entitled to present a hypothetical incorporating "all the facts the Plaintiff has proved." Whether it was so entitled is the point at issue.

Plaintiff argues that defendant, having "neglected or refused to introduce any testimony as to the cause of the accident," was proceeding contrary to the doctrine of *res ipsa loquitur* in attempting to elicit an opinion on the basis of plaintiff's incomplete facts. As we have held, under the doctrine of *res ipsa loquitur* the jury was entitled to, but was not required to, infer negligence. The gist of the matter is that defendant was seeking to elicit an opinion that the facts were not sufficient to sustain an inference of negligence.

The record amply shows that it was not necessary to put the hypothetical question in order to (1) show that mast failures do occur which are unexplained by anything in the handling of the vessel and which are due to latent defects; (2) ascertain how frequently latent defects are the cause, as compared with other causes; and (3) point out the gaps in the proof. It is a sound principle that

expert opinions should not be extended beyond the point of necessity, and that encroachment upon the province of the jury should be avoided if possible. As stated in *Pires v. Kanahuna*, 26 Haw. 376, 380, the test of the admissibility of expert evidence is whether the jurors are incompetent to draw their own conclusions from the facts without the aid of such evidence. We are of the view that a correct result was reached on this point, despite the error in requiring special proficiency in the sailing characteristics of catamarans. It was for the jury to determine whether the accident was one which ordinarily does not occur in the absence of negligence. The balance of probability rested with the jury, and there was no necessity of eliciting an expert opinion on this ultimate question.

### Testimony of Defendant's Former Employee, Plaintiff's Witness

As seen, plaintiff's witness, defendant's former employee, testified that the general condition of the catamaran was "very poor," and that "everything was run down and everything was worn out." At the jury's request, made after several hours of deliberation, there was read to the jury a portion of this witness' direct examination, the jury having inquired "whether his testimony regarding the general condition of the vessel was strictly struck out or it was used as part of the evidence." This question was presented along with a request for rereading of instructions on the points to be kept in mind "in order to arrive at this res ipsa loquitur."

The evidence concerning the condition of the vessel was concrete evidence that defendant was not carrying on a shipshape operation. It increased the probability of negligence, and was circumstantial evidence of a kind more readily understood by the jury than the workings of *res ipsa loquitur*.

94

The witness, Kirkwood Clark, was not a member of the crew of the catamaran involved, the Makani Kai, on the day of the accident, though he had been on many occasions. The practice was to change boats from day to day; he skippered the Makani Kai two or three times a week during the period of a month and a half immediately prior to the accident.

Plaintiff, by interrogatories, had obtained the names of the members of the crew on the day of the accident, but had not asked for the names of all who were in defendant's employ at the time of the accident. Plaintiff also had asked for the names of persons interviewed by defendant concerning the accident, but Mr. Clark's name was not mentioned in that connection. At pre-trial, each party listed his witnesses; Mr. Clark was not mentioned. Rule 17 of the Rules of the Circuit Court, First Circuit, provides that when a pre-trial is held, each party "shall disclose * * * the names and addresses of all witnesses that he intends to call."[7]

It appears that on the evening of the second day of trial, plaintiff's counsel interviewed Mr. Clark, who was then the owner of the Makani Kai, having bought it in November 1963. The purpose of the interview was to lay a foundation for a view. Evidently, plaintiff's counsel ascertained during this interview that Mr. Clark had been in defendant's employ at the time of the accident, and had actually seen the Makani Kai shortly after the accident. Plaintiff called Mr. Clark as a witness upon the opening of the trial the next day, the third day of trial. There is no suggestion that defendant was told in advance that Mr. Clark was to be called. Defendant's counsel, after a brief interval during which it was brought out that the

---

[7] The pre-trial order provided for by H.R.C.P., Rule 16, was not entered, but we deem that immaterial as "both counsel agreed that it was not necessary to have a pre-trial order," as entered in the minutes.

witness was a licensed catamaran skipper, objected that the witness "was not disclosed as a witness in the pre-trial," and that "there is no showing that this witness could not have been disclosed before this morning."[8] The objection was made as promptly as could be expected, making allowance for the time required to check the pre-trial list of witnesses. It was summarily overruled. The ruling is brought up for review by Specification of Error No. 6.

When the examination of this witness went into such matters as the witness' observations of the condition of the vessel at the time of and immediately after the accident, it represented a substantial departure from the theory of the case stated by plaintiff on the occasion of the first pre-trial hearing. Defendant does not make a point of this, but it has bearing on the prejudice involved. At the first pre-trial hearing, March 15, 1963, plaintiff sought and obtained leave to amend the complaint. The amendment added the words "and maintaining," so as to cause the complaint to aver, not only that defendant was negligent in operating the catamaran, but also that it was negligent in maintaining it. In seeking leave for the amendment at this time, the first pre-trial hearing on March 15, 1963, plaintiff stated that she would rely on *res ipsa loquitur*. Defendant objected to the amendment stating that "it is late in the proceeding to enter into a new theory of the case," but the court allowed it. By the examination of Mr. Clark as to matters such as those above indicated plaintiff again changed the theory of the case by offering direct evidence of negligence instead of

---

[8] While no showing on the point was made at the time, at the end of direct examination of Mr. Clark, plaintiff's counsel asked the witness: "When is the first time you ever saw me?" but on defendant's counsel starting to object the court ruled it was not material. Such showing, of course, should have been made at the outset but out of the presence of the jury.

merely relying on *res ipsa loquitur*.[9] Both under Rule 17 of the First Circuit and the notice of pre-trial conference issued in this case, disclosure of the theory of the case on the part of each party as well as the list of witnesses of each, was required.

Plaintiff, after learning of Mr. Clark's availability, could have called for a conference out of the presence of the jury at or before the opening of court the next morning, to make arrangements for going into this line of evidence that would be fair to both parties. Pre-trial becomes a trap, not an aid to trial, if one of the parties is permitted to proceed as was done here.[10] We are satisfied that plaintiff had an adequate reason for not having

---

[9] There is no objection to a plaintiff offering both types of proof, *i.e.*, general evidence under the *res ipsa loquitur* doctrine and direct evidence of negligence. *Cf., Morgan v. Yamada, supra*, 26 Haw. 17, 26-27 (as to proceeding under the *res ipsa* doctrine after pleading specific acts of negligence) ; 2 Harper & James, *Torts, supra*, § 19.10, at 1098 (when a plaintiff offers specific proof it should be given no more than its logically probative effect; if it is insufficient as an explanation of the accident there is no sound basis for denying application of the *res ipsa* doctrine).

However, plaintiff's statement that she would rely on *res ipsa loquitur* did not indicate that she would pursue the course of offering both types of proof.

[10] For example, defendant's counsel argues that it would have been imprudent for him to have cross-examined as to the condition of the vessel, which was the subject of broad, general statements on direct. "One simply cannot take such privileges with a surprise witness," is his argument. It may well be that defense counsel was not prepared to cross-examine on this subject. According to the answers given by defendant to plaintiff's interrogatories in December 1963, the general manager of the defendant's business had died, and the whereabouts of the two crew members who were on the Makani Kai at the time of the accident were unknown, though one of them had been interviewed by defendant's counsel in 1960.

As seen, the original complaint was based on the negligent *operation* of the vessel. It was not until three and a half years after the accident that the complaint was amended to allege negligent *maintenance*. Even after the amendment of the complaint on March 15, 1963, there was no indication that plaintiff would offer direct evidence of negligent maintenance. On the basis of the pre-trial hearing defendant may have adopted the line of defense to *res ipsa* suggested by 2 Harper & James, *Torts*, § 19.12, at 1106, where the authors state: "Logically defendant's best line of defense would often be to show that such accidents *do happen*—perhaps not infrequently—in spite of all reasonable precautions."

made pre-trial disclosure of the line of evidence to be offered through Mr. Clark, but plaintiff's counsel should have been required to explain the situation before the surprise witness was examined, and defendant should have been given an opportunity to go into the matter.

Cases in jurisdictions in which there was no standing order or rule as to the disclosures required at pre-trial are not in point here. Rule 17 of the First Circuit must be taken into account and given proper effect. Counsel practicing under that rule should be able to rely on it in preparing for trial. *Cf., Thompson* v. *Calmar S.S. Corp.,* 331 F.2d 657, 662 (3d Cir.) ; *Taggart* v. *Vermont Transp. Co.,* 32 F.R.D. 587 (E.D. Pa.), *aff'd,* 325 F.2d 1022 (3d Cir.) ; *McGuill* v. *Bergey,* 3 F. R. Serv. 2d 16.32, Case 4 (E.D. Pa.). We conclude that the summary overruling of defendant's objection constituted an abuse of discretion.

If this were the only error we would hesitate to reverse on account of it, but when it is taken together with the matters considered *infra* under the headings "Plaintiff's Pre-trial Affidavit" and "Testimony of Plaintiff's Non-treating Medical Expert," we find that a new trial is called for.[11]

### Plaintiff's Pre-trial Affidavit

Prior to disallowance of the special damages,[12] defend-

---

[11] Another specification, No. 7, presents nothing of substance. It has to do with testimony of Mr. Clark as to work done on the Makani Kai and what happened to the craft during the five years intervening between the accident and the trial. Plaintiff was endeavoring to lay foundation for a view by showing that the craft was not substantially changed. Defendant took it that plaintiff was trying to show precautions taken after the accident as a basis for an inference of negligence. It would have been better if plaintiff had made arrangements to offer this testimony out of the presence of the jury. Then, if a view was ordered, such part of the testimony as was needed to make the record complete could have been offered again in the presence of the jury. However, we perceive no prejudice.

Specification of Error No. 8 asserts that Mr. Clark's testimony as to the general condition of the vessel was irrelevant, but as above noted we do not so regard it.

[12] As seen, these ultimately were disallowed because the husband had withdrawn his claim.

ant in preparation for trial sought production of "all bills, statements, invoices, receipts or other records or documents" reflecting the services rendered, or goods or materials furnished, for which certain checks were drawn. A list of checks numbering over 70 in all was furnished, derived from a deposition of plaintiff's husband. The list included numerous disbursements to an establishment called "Hawk's," a drug store, and disbursements to other drug stores, plaintiff's doctors, and others. Counsel are agreed that on December 3, 1963 the court announced that an order would be signed requiring the production of any of the bills, statements and the like which plaintiff or her husband has "or over which they have control or are in a position to obtain * * *." In fact, the order was not signed until May 15, 1964, and then was signed "nunc pro tunc December 3, 1963." Meanwhile, on the assumption the order had been signed, plaintiff's counsel forwarded the order to plaintiff in Kansas[13] with the direction that she call or write to "various drug stores, etc., securing statements verifying the amounts claimed."

After defendant had moved for a sanctioning order on the ground that there had been no compliance with the order, plaintiff furnished an affidavit, sworn to by her before a Kansas notary, which her attorney filed in open court on the hearing of the motion for the sanctioning order on February 19, 1964. In this affidavit she stated:

"That she has made a diligent search of her records for invoices and bills as requested by Order of this Court; and that she has attempted to obtain copies of invoices from various establishments, drug stores, and other places wherein she has incurred expenses and finds that it is almost an impossibility to acquire the same; and that the cancelled checks are the best

---

[13] Plaintiff is a resident of Wichita, Kansas, who was only temporarily in this State when injured.

evidence which she can produce in order to substantiate said expenses; * * *."

The affidavit having been filed, defendant requested a continuance, which was granted. Defendant took plaintiff's deposition on March 30, 1964, and learned that plaintiff had in fact contacted only one drug store, Hawk's, which recurred most frequently on the list, and had concluded from her lack of success in this instance that it was useless to make further inquiries. She had not contacted any of her doctors for copies of their statements.[14]

After the deposition was taken defendant renewed its motion for a sanctioning order. The court denied the motion on the ground that there was no signed order.

---

14 "Q. * * *

"In connection with Mr. Cozine's deposition we were furnished with a rather extended list of disbursements which he stated were related or were a result of this accident.

"There is, among the disbursements made, a rather substantial list of checks that were written to Hawk Drug Stores; now, do these disbursements to Hawk's represent payment for prescription medicine?

"A. Yes."

  *          *          *          *          *

"Q. * * *

"Listed among these various disbursements to drug stores are also disbursements to the Apothecary Shop and to Gessler's Drugs, to Dockum Drugs, and Archer's Drugs, and Korney's Drugs (?) Store?

"A. No, that is an out of town drug store, and I can't—seems to me like it was in Denver.

"Q. Okay. And also some checks, or a check to Hollabaugh's.

"Now, these disbursements to these various druggists were all for prescription items or other medications?

"A. Things for me."

  *          *          *          *          *

"Q. * * * You testified that you had inquired of the pharmacist at Hawk's Drug if he could provide you with a statement concerning your purchases from him; you did not tell me this just a moment ago.

"A. I asked him because I received, maybe it was a letter or something, asking me for receipts and so on and so forth, and I tried to find things at home, anything that I thought would be pertinent to what you were asking for, and I called the drug store and I asked them if they kept, because I didn't have any prescription numbers, I don't have any of the drugs that I had taken in the past, and I asked him if he had any way of getting me a list of what I had purchased from him and he said no, that they didn't catalogue or keep it that way where he could pull it out for me, so—

We deem the question of the sanctioning order moot, and it will not be further reviewed. At most, the listed disbursements might have been denied as special damages; that has been ordered, though at a different stage of the case. The suggestion that the entire action might have been dismissed because of the affidavit, involving as it did only the one issue of special damages, does not merit consideration. A sanctioning order is not to be used for the purpose of punishment. 4 Moore, *Federal Practice,* § 37.03 (2d ed.) ; *cf., Von Der Heydt* v. *Kennedy,* 299 F.2d 459, 462 (D.C. Cir.).

It is in connection with Specifications 10 and 11 that a substantial question is presented in connection with this affidavit. On cross-examination of plaintiff, defendant began to question her about the statements in the

"Q. Of whom did you make this inquiry?

"A. I don't know his name, it's just one of the men that is over in the department..

"Q. At Boulevard Hawk's?

"A. At Hawk's, uh-huh.

"Q. And when did you make this inquiry of him?

"A. Well, I can't tell you the specific time, but it was shortly after I received the letter wondering if I had any of the receipts or anything that would be pertinent to the checks and what you would be asking for."

&ast; &ast; &ast; &ast; &ast;

"Q. * * * Did you make any inquiry at any of the other concerns whom I have previously named?

"A. No, because I thought if that was true of Hawk's, it probably was true of any others."

&ast; &ast; &ast; &ast;

"Q. * * * Mrs. Cozine, you stated that prior to this October 21, 1963, you had made inquiry to the various doctors' offices concerning the dates of services rendered and the nature of services rendered and you used that information to answer, to provide the answers to your interrogatories, to defendant's interrogatories which is that document a copy of which you have there. [The reference here was to answers to questions concerning doctors consulted both before and after the accident and the treatment received, not relating to particular disbursements.]

"A. Yes.

"Q. Have you made, at any time since the date of those inquiries inquiries to the various doctors offices for further information concerning dates of services and to whom rendered and copies of their statements to you and so forth?

"A. Not since this, no.

"Q. All right. Not since October 21, 1963, at the latest?

"A. No."

affidavit. She admitted signing it, and defense counsel attempted to examine her on particular statements therein. The court interrupted the examination, remarking that the affidavit, which had been marked for identification, was not in evidence. Defense counsel then offered it, and plaintiff's counsel indicated willingness that it be admitted, but on the court's inquiry as to the relevancy took the position that it was irrelevant and would lead to "a big long hassle." The court ruled "that the offer will be denied on the ground that it contains matter that will confuse the jury and prejudicial to the Plaintiff's case." Defense counsel offered to show by cross-examination of plaintiff and by her deposition that plaintiff swore falsely.

We first direct our attention to the right of defendant to cross-examine on the subject of this affidavit.[15] Even apart from the fact that this witness was the plaintiff in the case, she could as a witness be cross-examined as to specific acts affecting her credibility. *Republic* v. *Luning*, 11 Haw. 390; *Territory* v. *Buick*, 27 Haw. 28, 46. Such cross-examination rests in the discretion of the court, and is reviewable only for abuse of discretion,[16] but we find an abuse of discretion here. The witness being the plaintiff and the affidavit having been made in this very case, it was error not to permit cross-examination as to the truth of the statements made in the affidavit. *Cf., Pullman Co.* v. *Hall*, 55 F.2d 139 (4th Cir.) (reversal for denial of cross-examination as to the truth of plaintiff's affidavit

---

[15] On the record, it might be questioned whether the right to cross-examine on the subject of the affidavit was preserved for review, as distinguished from the admissibility of the affidavit itself. If the scope of the cross-examination was preserved for review it was solely by the offer of proof. *Cf., Choy* v. *Otaguro*, 32 Haw. 543, 557. However, no point has been made of this. In the interests of clarity we will separately consider the right of cross-examination.

[16] *Territory* v. *Goo Wan Hoy*, 24 Haw. 721, 726-27.

filed as a basis for proceeding *in forma pauperis*) ; *Hawkins* v. *Missouri Pac. R.R.*, 188 F.2d 348, 351 (8th Cir.) (admission of evidence as to plaintiff's false statement in application for employment, sustained).

Reversal will not be ordered on account of an error in restricting cross-examination unless it was prejudicial. *State* v. *Hashimoto*, 47 Haw. 185, 198, 389 P.2d 146, 154; *Merricourt* v. *Norwalk Fire Ins. Co.*, 13 Haw. 218, 221. Defendant contends there was prejudice here, emphasizing that plaintiff's damages rested largely on her subjective complaints, which we find to be a fair statement of the situation. The questioning on cross-examination sought to bring out that plaintiff, in this very case, had made a broad general statement that she had "attempted to obtain copies of invoices from various establishments, drug stores, and other places" when in fact, as her deposition showed, she had contacted only one drug store and thereafter had concluded that it was useless to go further. At the very least there was shown a willingness to gloss over the exact truth. That had important bearing on the question of whether plaintiff was exaggerating the pain and suffering endured as a result of the accident. Restriction of the cross-examination was prejudicial.

As to admissibility of the affidavit itself, that matter is discussed in 2 Wigmore, *Evidence,* § 278, at 122 (3d ed.), which has to do with the question of whether personal falsification by a party may be made a matter of independent proof. It is, of course, well settled that there are areas in which, though the cross-examination may proceed, the cross-examiner is limited to the witness' answers and is not entitled to show that the fact is other than the witness has admitted. *Territory* v. *Goo Wan Hoy, supra,* 24 Haw. 721, 727. But a party's falsehood or other fraud in the preparation or presentation of his case may be proved against him whether he is a witness

or not, as discussed in the cited section of Wigmore, *supra*. The reason is that such conduct is subject to the inference that the party is conscious that his case is weak or unfounded. *Cf., Nelson* v. *Lott,* 81 Utah 265, 275, 17 P.2d 272, 276; *Garippa* v. *Wisotsky,* 108 N.Y.S.2d 67, 72-4 (Sup. Ct.), *aff'd,* 305 N.Y. 571, 111 N.E.2d 443. More is involved in this rule than the mere impeachment of a witness, and 4 Jones, *Evidence,* § 932 (5th ed.), cited by plaintiff, has no bearing.

Here the affidavit had to do only with the special damages, which were no longer in issue. *Georgia R.R. & Banking Co.* v. *Lybrend,* 99 Ga. 421, 434-35, 27 S.E. 794, 798-99, cited by defendant, was a different type of case. In *Masterson* v. *Berlin St. Ry.,* 83 N.H. 190, 139 Atl. 753, 756, the alleged falsehood was contained in a deposition of the plaintiff in which she swore that she had not sued one Fraser when in fact he had been a co-defendant in the case together with the railway, and had been dismissed after a settlement made with him. The court deemed "the falsehood, if found, related to a collateral matter * * *." The case therefore is pertinent here.

The court in *Masterson* concluded that the trial court erred in excluding the evidence without considering the falsity of the deposition, saying:

"* * * The line is not drawn between important and unimportant misconduct in connection with litigation, but all such misconduct is serious and differs only in its degree. Although the plaintiff's lack of faith in the claim against Fraser had no bearing on the railway's liability, and showed, if it showed anything in respect to that liability, that she had, rather than lacked, faith in it, yet her testimony in the deposition, if false, constituted misconduct in the litigation and thereby, of itself, made a measurable discount

of the merits of the litigation as to her." (139 Atl. at 756).

In the present case, as in *Masterson, supra,* the court did not pass upon the falsity of the affidavit[17] but went upon a different ground. The court remarked that:

"THE COURT: Mr. Tolzmann, the danger of this piece of evidence is that it will only tend to confuse the jury because you are talking about incurred expenses and requiring invoices and so on, and they might get the idea that unless she produces invoices, no pain and suffering for her."

There of course was no issue for the jury as to whether plaintiff ought to have obtained the desired invoices. The question was one of falsification in the affidavit. While admission of the affidavit itself into evidence might have confused the jury in view of its subject matter being no longer of significance, the jury could have been instructed so as to avoid the confusion. Moreover, proper cross-examination, had it been allowed, might have sufficed for defendant's purposes, and the affidavit might then have been rejected as merely cumulative. The point is that the matter could not be excluded altogether. *Cf., Masterson* v. *Berlin St. Ry., supra,* 83 N.H. 190, 139 Atl. 753, 757.

Most of the argument on this point was conducted outside the presence of the jury. Before the jury was excused plaintiff had been asked whether she had sworn "that certain facts relating to this lawsuit were true which were not true," the nature of the affidavit had been indicated, and plaintiff had admitted signing it. Plaintiff also

---

[17] At one point the court stated "I don't think she made a false statement," but the court subsequently heard argument on what appeared in the deposition, whereupon the court ruled:

"I don't want to try two cases."

Therefore the court's final ruling was that it declined to pass on the falsity of the affidavit. By excluding the affidavit altogether the court prevented the jury from doing so. This is the same situation as was presented in *Masterson.*

had volunteered the statement that she "made an effort to find the receipts." While the jury was still present plaintiff's counsel stated: "* * * [W]e have nothing to hide from the jury. We are perfectly willing to offer it into evidence." After argument out of the presence of the jury, the jury returned to the courtroom and was informed that the offer was refused. We cannot agree with plaintiff's contention that "the jury was left with the impression that on a very important document, Mrs. Cozine had not told the truth." The prejudice was to defendant, not to plaintiff.

### Testimony of Plaintiff's Nontreating Medical Expert

Specifications Nos. 13-15 relate to testimony of plaintiff's medical expert, Dr. Silver, who had examined plaintiff a few days before the trial in order that he might give an opinion regarding her condition. He was not asked to treat plaintiff. By objections interposed and overruled during the direct examination of Dr. Silver, presented here by Specification No. 13, defendant took the position that a nontreating medical expert cannot base his opinion on what the plaintiff has related to him; and that the opinion of a medical expert cannot be based on the reports of other doctors, made out of court. However, the evidence objected to was ruled out on other grounds. We will direct our attention primarily to Specification of Error No. 15. This specification is based on the denial of a motion to strike, made at the end of cross-examination of Dr. Silver.

It is, of course, clear that a medical expert opinion must have sufficient evidentiary basis. *Kawamoto* v. *Yasutake*, 49 Haw. 42, 410 P.2d 976. We proceed on the assumption that a hypothetical question put to the doctor by plaintiff's counsel, a very long one, fairly stated the

**106**

evidence.[18] But the answers of the witness on cross-examination disclosed that Dr. Silver had not confined himself to the hypothetical in arriving at an opinion. A nontreating medical expert cannot base his opinion on the plaintiff's out-of-court statements as to her past condition, not shown to be the same as the evidence of record. Nor can a medical expert opinion be based on the reports of other doctors, which are not of record and contain matters of opinion. The testimony in question was in violation of these rules.[19] *Cf., Henderson* v. *Union Pac.*

[18] The specifications of error do not present any contention to the contrary.

[19] Dr. Silver was not supplied with a copy of the hypothetical question at any time. He testified that he was, however, "supplied with a copy of the reports of other doctors," and identified these doctors. Dr. Silver also was given a written report which plaintiff made to her own doctor, Dr. Shaw of Wichita, Kansas, describing the accident and her symptoms. He himself, when he saw plaintiff shortly before the trial, obtained from her a description of her past condition. The witness testified on cross-examination:

"Q. * * * To what extent did consideration to the materials you have just described assist you or in any way influence you in reaching your best judgment in this matter?

[Objection by plaintiff's counsel, overruled.]

"A. These reports gave me what I believe is a more detailed description of the patient's symptoms and the sequence of events in the patient's clinical history than the patient herself is able to give, I believe, at the present time. And, also, by virtue of having these reports at hand, they reduced the amount of time spent in attempting to question the patient regarding the sequence of events and the symptoms that occurred.

"So I regard these reports as extremely helpful in my formulating my own opinion, and I believe that this is my opinion independent of the opinions appearing in their reports by the doctors who write them, but I must admit that it is very difficult to separate any conclusions reached by other doctors from my own conclusions insofar as part of my analysis of this case, or of any case, must necessarily include what opinions have been rendered by other doctors along the line.

"I don't know if that answers your question.

"Q. It does. Thank you, Doctor.

"The question, of course, was addressed to all the materials you have described. Would that include the prepared written statement by Mrs. Cozine—was this of assistance to you?

"A. It was of assistance in defining the sequence of events as it happened from her point of view.

"Q. And did this statement assist you or in any way influence you in reaching your best medical judgment in the matter?

"A. Well, I would say that all information, including that, assists me in reaching my best medical judgment in this case or, in fact, in any case.

*R.R.*, 189 Or. 145, 167, 219 P.2d 170, 179-80; *Fidelity Union Cas. Co.* v. *Dapperman*, 47 S.W.2d 408 (Tex. App.); *Brouillette* v. *Weymouth Shoe Co.*, 157 Me. 143, 170 A.2d 412; *Zelenka* v. *Industrial Comm.*, 165 Ohio St. 587, 594-95, 138 N.E.2d 667, 672; *Baumhoer* v. *McLaughlin*, 205 S.W.2d 274, 280 (Mo. App.).

Plaintiff contends that Dr. Silver was not asked for any opinion he might have had on the basis of the reports of others, and only answered the hypothetical question. It is argued that "his answer to the hypothetical question was based solely upon the hypothesis contained therein,"

"Q. Thank you, Doctor. When you saw Mrs. Cozine on—when was it?

"A. May 27.

"Q. May 27. Did you invite her to describe her past condition?

"A. Yes, I did.

"Q. Did you, indeed, ask her to describe her past condition or symptoms in some detail?

"A. Yes, I did.

"Q. And is your best medical judgment on this matter today based to any great extent upon your interview with her concerning her past condition and symptoms?

"A. That part of it that relates to the history of the injury and symptoms she had following the injury but before she was examined by me, yes.

[Objection to next question overruled, but question withdrawn after the witness said he could not answer it as worded.]

"Q. When you undertook this case did you feel that it was important to enable you to form a judgment to question Mrs. Cozine concerning her past symptoms and condition?

"A. Yes, I did.

"Q. Do you believe that you would have been able to give us the benefit of your best medical judgment on this matter today if you had not so interviewed her?

"Does something in my question make it difficult?

"A. I'm trying to answer the question to the best of my ability, and it relates to the fact that sometimes I am called upon to render a judgment, let's say in a case of a patient who is deceased—whom I have never examined. Now, I feel that if I have an adequate amount of information available in such a case, that I will give my judgment in such a manner in the best way I know how. Obviously, the correctness of my opinion or the validity of any conclusion to which I come will depend on how much there is in the way of factual material. And I've tried to indicate that in this case.

"In the case of Mrs. Cozine, to get right to the heart of your question, had I never spoken to her—if all this material was presented to me—I might or might not be able, or willing, to render an opinion depending on how adequate the information and the material was. And I would so state."

citing *Lee* v. *Minneapolis St. Ry.*, 230 Minn. 315, 317-18, 41 N.W.2d 433, 435-36, and *Feldstein* v. *Harrington*, 4 Wis. 2d 380, 390-91, 90 N.W.2d 566, 572, *rev'd on other grounds*, 8 Wis. 2d. 569, 99 N.W.2d 694. However, the record does not support this contention. Dr. Silver testified that he based his opinion in part on the out-of-court statements and reports. He specifically stated it was very difficult for him to separate his conclusions from those reached by the other doctors. The hypothetical occupied nearly five pages of transcript; Dr. Silver had prepared his opinion without having a copy of the hypothetical[20] and was hearing it for the first time without even having a copy before him. In view of Dr. Silver's testimony on cross-examination we cannot accept the view that his answer to the hypothetical was separate and apart from, and had no basis in, the extraneous material. As the record shows, the trial court did not so view it but ruled on another ground.[21]

While there was error, there is a question as to whether defendant's motion to strike preserved the error for review. The motion to strike was "to strike the doctor's testimony in its entirety." The testimony in its entirety included testimony as to examinations which Dr. Silver himself performed, including an electroencephalographic examination which, the doctor concluded, showed that

---

[20] See note 19.

[21] This appears in connection with Specification of Error No. 20. That specification has not been separately argued, and we consider it only for what it reveals as to the court's ruling on Dr. Silver's testimony. The record shows that defendant sought to have the jury instructed that a nontreating medical expert may not give an opinion based in whole or in part "upon the history of the case as related to him by the injured person" or "upon the statements of other physicians made outside of court." In refusing the requested instruction, Defendant's No. 16, the court ruled that it was "a comment on rules of law that do not concern the jury," and stated further:

"* * * I ruled that a doctor engaged solely by a party·plaintiff cannot come in and testify as to what her aches and pains were. In private, the patient can give the history. Then he can come in court and give his findings."

there was "some suppression of the normal voltages from the left cerebral hemisphere, that is, the left side of the brain," indicating "some previous damage to that cerebral hemisphere of the brain." This electroencephalographic examination was the subject of Specification No. 14, the objection being that there was only one electroencephalogram taken, and that the doctor himself had stated that to draw any conclusion therefrom was "somewhat speculative" in the absence of serial electroencephalograms. After considering Dr. Silver's testimony on this point as a whole, we do not deem the testimony too speculative to have been considered. The objection went to the weight of the testimony. *Cf., Dzurik* v. *Tamura,* 44 Haw. 327, 330, 359 P.2d 164, 165-66.

A motion to strike evidence must state the grounds. H.R.C.P., Rules 7(b)(1) and 46; 53 Am. Jur., *Trial,* § 147; 4 C.J.S., *Appeal and Error,* § 290 at p. 887; *cf., Territory* v. *Rodrigues,* 30 Haw. 198, 200. And a motion to strike the entire testimony of a witness is properly denied if any portion of the testimony is admissible. *Territory* v. *Adelmeyer,* 45 Haw. 144, 156, 363 P.2d 979, 986. In this instance a part was admissible. Moreover, defendant failed to point out the significance of the cross-examination. It was not until the cross-examination was concluded that it was made clear that the doctor's answer to the hypothetical question was objectionable. Previously, by objections during the direct examination of Dr. Silver, defendant had made the point that: "If this doctor bases his opinion on anything, I have a right to have those premises stated here. I can't cross-examine him as to information which was given to him outside of the courtroom. I want the information given to him in a properly-framed hypothetical question so I can test it." The court had ruled against defendant, holding that as a nontreating medical expert Dr. Silver could testify as to "any

connection between his findings and the history given by Mrs. Cozine." As above noted, the evidence to which defendant's objections related at this point was ruled out on other grounds. We accordingly deem Specification No. 13 insufficient to present a point for review. Later in the direct the hypothetical question was put and the doctor's answer thereto tested on cross-examination. The motion to strike made after cross-examination, was simply that: "For the record I would like to interpose a motion to strike the doctor's testimony in its entirety." This was too general, both in seeking to strike *all* of the testimony of Dr. Silver and in failing to state any grounds for the court's consideration.

However, plaintiff makes no contention here that the motion to strike was improper in form. Plaintiff's contention is that the doctor merely answered a proper hypothetical question—that the cross-examination was of no significance. With this we cannot agree, as above stated. As appears from the record reviewed in footnote 21, the court took still another view, that is, that there was no objection to a nontreating medical expert testifying to a conclusion based in part on the history given him by the patient. Since the court had this point well in mind and as to it at least was not misled by the form of the motion to strike, and since plaintiff makes no contention here that the motion to strike was in improper form, under the circumstances we deem the record sufficient to show reversible error notwithstanding the ordinary rule that a motion to strike must state the grounds and point out the particular evidence objected to.

### Testimony of Lay Witnesses

Depositions of plaintiff's fellow passengers were taken by plaintiff and read into evidence after the court had ruled on objections. Defendant caused to be stricken

from the deposition of Perry Thayer his statement that when he picked plaintiff up immediately after the accident he "thought she was probably dead." But defendant objected to the striking from the same answer of the statement that when the witness saw plaintiff later—he meanwhile having been busy helping with the mast— plaintiff's eyes were open and she said "I will be all right." Again, defendant caused to be stricken from another answer of the same witness concerning plaintiff's condition after the accident the statement that "she was goofy" and "didn't talk like Nana generally does," but wanted to leave in the statement that "she would just say once in a while 'I am all right.' "

Defendant argues that plaintiff's statement that she was "all right" was spontaneous and admissible as part of the *res gestae*. It is unnecessary to decide this point. We sustain plaintiff's contention that the admission of partial answers would have been prejudicial to plaintiff in these instances.

A more serious question is presented by the court's ruling against defendant's objections to certain statements as to plaintiff's condition contained in the deposition of her husband, as follows:

(1) Referring to the week or so during which Mr. and Mrs. Cozine stayed on in the islands after the accident, Mr. Cozine testified that "her condition remained very muchly in a state of shock, she was very drowsy, suffered continuous headaches and was very sore * * *." At the trial, defendant objected that the husband "isn't competent to say how his wife feels"; and argued against "matters of opinion of this sort from a layman." Plaintiff contended that "a husband of 26 years can recite the answers that he has in here," and that it was a layman's description of what he observed.

(2) Referring to a period of two and a half years

after the accident, the husband testified that "she was taking sedatives, she was taking drugs through most of the time"; that "her general health and rest was completely abnormal"; that "emotionally she was completely upset and not herself"; that "it became necessary that we use household help almost continuously."[22] At the trial defendant objected that this testimony was "hearsay and in confidence [incompetent] testimony of the rankest sort."

At the time of taking of the deposition there was no objection to any of the foregoing. Pursuant to H.R.C.P., Rule 32(c)(1) and (2), the general rule is that objections to the competency of testimony are not waived by failure to make them during the taking of the deposition, but there is an exception to that general rule which is important here. As provided in H.R.C.P., Rule 32(c)(2):

"(2) Errors and irregularities occurring at the oral examination * * * in the form of the questions or answers * * * and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition."

Application of the rule is illustrated by *Cordle* v. *Allied Chem. Corp.*, 309 F.2d 821, 825-26 (6th Cir.), in which the testimony of a doctor had been taken by deposition. It was contended that he was a nontreating medical expert who could not give an opinion based on subjective symptoms. The court deemed the doctor competent to give an opinion under the Kentucky rule. However, the doctor had testified to the history and subjective symptoms as given to him by the patient, and the court stated:

"* * * The objections now directed at the doctor's testimony were not made at the time of taking the

---

22 The testimony as to the necessity of household help was admitted for the limited purpose of showing plaintiff's physical condition.

deposition. Objections to the competency of a witness and to the competency, relevancy and materiality of testimony taken on deposition, are waived if not made before or during the taking of the deposition, if the ground of the objection is one which might have been corrected if made at that time. Rule 32(c)(1)(2). * * * We think these objections fall in that category. The doctor could have been instructed not to state the history and symptoms as given him by the plaintiff and hypothetical questions could have been framed, based on the history and symptoms of the plaintiff, as his counsel must certainly have known them at that time."

Applying the rule here, we deem defendant to have waived its objections. Even if the answers were objectionable the subject matter could have been covered in a different way. What was involved was the form that the testimony should take.

The general rule is that a nonexpert witness who has had suitable opportunity for observation may state inferences from transient physical appearances, as that a person was in pain or suffering, when the circumstances are such that all the facts cannot be placed before the jury with such clearness as to enable them to draw a correct inference, and the inference is not one for the drawing of which special skill, knowledge and experience are required. *Tsuruoka* v. *Lukens*, 32 Haw. 263. As in other instances[23] this rule is to be applied with due regard for the requirement that encroachment upon the province of the jury should be avoided if possible. Nevertheless, as held in *Tsuruoka*, a nonexpert witness, there the father of the plaintiff, an eight-year-old child, under proper circumstances may state his opinion or conclusion, as that plaintiff "suffered considerably" from a broken leg re-

---

[23] See *supra*, under heading "Testimony of Defendant's Expert."

ceived in an accident. See Annots., 28 A.L.R. 362, 364; 97 A.L.R. 1284, 1291.

Where an opinion or conclusion is not proper, the manifestations of physical condition should be required to be stated in detail. But in the absence of objections made at the time of taking of the deposition we deem it unnecessary to pass on the form of the answers here given.

### Requested Instruction as to
### Necessity of Expert Testimony

Contending that where plaintiff's symptoms are subjective it requires expert testimony to establish the causal connection between plaintiff's ailments and complaints and the accident, defendant offered an instruction embodying the rule contended for and further instructing the jury that the jury must disregard plaintiff's ailments and complaints "if such bodily ailments and complaints remain, in your opinion, unexplained by proper medical testimony." The court refused the instruction, defendant's requested Instruction No. 12, on the ground that: "It will be commenting too heavily on the evidence." Defendant contends this was error.

We have no occasion to pass on the rule contended for as to the necessity of expert testimony. Assuming without deciding that expert testimony was necessary to establish the causal connection between plaintiff's ailments and complaints and the accident, it was within the court's discretion to refuse the instruction on the ground stated. The instruction was unnecessary.

Medical expert testimony had covered the matter of causal connection. But as held in *Dzurik v. Tamura,* 44 Haw. 327, 329, 359 P.2d 164, 165: "A case involving a medical issue * * * is no exception to the rule that, when there are conflicting inferences and conclusions, it is the function of the trier of facts to select the one which it

considers most reasonable." The jury was instructed by Defendant's No. 18 that:

"You must resolve any conflict that may exist in the testimony of expert witnesses. To that end, you must weigh one expert's opinion against that of another in the light of all of the circumstances which in your judgment affect the weight of the several opinions. Thereupon, you shall find in favor of that expert testimony which, in your opinion, is entitled to the greater weight."

An instruction given by agreement informed the jury in pertinent part that:

"To the extent that any opinion testified to by a doctor is based upon subjective symptoms stated to him by a Plaintiff, the jury are entitled to consider the trustworthiness of such statements in determining the weight to be given the opinion."

In addition, the jury was instructed by Defendant's No. 22 that in order for plaintiff to prevail she must prove, among other matters, that plaintiff "suffered injury" as a "direct and proximate result of such accident," and by Defendant's No. 15 that the jury "must be satisfied" that a medical expert was basing his opinion "upon a reasonable medical certainty" before considering such opinion as "having established a causal connection between the accident or injury and the bodily ailment or complaint."

The jury having been thus instructed, it was not necessary to further instruct the jury that, if not satisfied with the medical testimony connecting up plaintiff's ailments and complaints with the accident, it must disregard such ailments and complaints. There was no reasonable ground for apprehension that the jury would find the medical testimony on such point unsatisfactory yet find the fact itself proven.

Other specifications of error do not merit review.

Reversed and remanded for a new trial.

*C. Jepson Garland* (*Tobias C. Tolzmann* with him on the brief, *Anderson, Wrenn & Jenks* of counsel) for defendant-appellant.

*Albert Gould* (*Cobb & Gould* of counsel) for plaintiff-appellee.

---

CONCURRING OPINION OF MIZUHA, J.

I believe restriction of cross-examination as to the truth of statements made by plaintiff in an affidavit filed in this case was prejudicial error requiring reversal, and solely on that basis concur in this judgment.